UNITED STATES of America, Appellee,

v.

Leroy KENDRICK, Appellant.

No. 8752.

United States Court of Appeals Fourth Circuit.

Reargued Nov. 5, 1963.

Decided April 15, 1964.

 

Emmet J. Bondurant, Atlanta, Ga. (Court-assigned counsel) (Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., on brief), for appellant.

William Medford, U. S. Atty. (James O. Israel, Jr., and Robert J. Robinson, Asst. U. S. Attys., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and BELL, Circuit Judges, sitting en banc.

PER CURIAM.

This is an appeal from the District Court's decision denying, after hearing, the petitioner's motion under 28 U.S.C.A. § 2255 to vacate an illegal sentence on the grounds that the petitioner was incompetent to stand trial. The Government now concedes that this question is properly raised under 28 U.S.C.A. § 2255. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956), reversing per curiam, 96 U.S.App.D.C. 117, 223 F.2d 582 (1955); Fisher v. United States, 317 F.2d 352 (4 Cir. 1963); Nelms v. United States, 318 F.2d 150 (4 Cir. 1963).

The petitioner, who is forty-four years of age, has spent most of the last thirty years in and out of prisons. At nineteen, he began his jail career after having spent some years in reformatories. In June of 1952 he was adjudicated insane by the North Carolina courts and committed to an institution for the criminally insane. Escape followed, and in 1954 we find him in trouble in South Carolina. On January 13, 1959, he was again remanded to the North Carolina state hospital for the insane, where he stayed until March 16, 1959. His present petition attacks his trial of November 17-23, 1960, when he was tried and sentenced to seven years for three thefts from interstate commerce committed between July and September of that year.

The substance of his allegations in the present action is that he was adjudicated insane by the North Carolina courts in 1952, and has never since then been adjudicated sane; that at his trial in November of 1960 he was insane and suf-

fering from amnesia; that as a result of his disabilities he was not competent to stand trial. He alleged that he lost his memory as the result of a wreck in June 1959 and did not recover it until after psychiatric treatment during his present jail term.

At the hearing below the case for the petitioner consisted of a certified copy of his adjudication of insanity in 1952 and his own testimony. In addition to his testimony of amnesia and a long history of being in and out of mental hospitals, he testified in great detail to psychiatric treatment which he had undergone during his present confinement. He testified that he was confined in the psychiatric section of the prison hospital, where he was administered paraldehyde, as a result of which he regained his memory; that he had also received electric shock treatments and undergone extensive psychoanalysis; that he was assigned an accelerated work schedule as a form of psychotherapy. He also testified that he underwent a brain operation and a kidney operation to relieve a condition that had caused him frequent blackouts. During his testimony, the petitioner named the doctors from whom he contended he had received the treatment.

◼ The Government's case consisted of the testimony of counsel appointed by the Court to represent the petitioner at his trial in 1960 and of the F.B.I. Agent who arrested him. Both of these witnesses testified to the extent of their contacts with the petitioner and stated over objection from petitioner's present counsel that in their opinion he was sane and competent to stand trial, and that in their opinion he knew the difference between right and wrong.[1] The Court permitted the Government to put into the record letters from psychiatrists and psychiatric reports dealing with the petitioner's competency to stand trial which the Agent had collected in preparation for the hearing. These letters and reports were based on examinations of the petitioner which were made between the time of his lunacy inquisition in 1952 and his discharge from the North Carolina hospital for the insane on March 13, 1959, some twenty months prior to the trial which was attacked by this proceeding and before the alleged loss of memory due to an accident in June of 1959. A decision based on this evidence raises serious questions as to the ability of layman to interpret psychiatric clinical reports without expert assistance and especially to evaluate the relevancy of such evidence to petitioner's mental condition at the subsequent trial date. Cf. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

◼ The Court's finding that the medical file of the petitioner at the United States Penitentiary, Atlanta, Georgia, reflects no mental disorder is without adequate record support. We can find only one reference to such a file in the record. On cross-examination, the F.B.I. Agent, in an attempt to support his opinion testimony, stated as follows:

"On March 22, 1962, a review of Kendrick's medical file at U. S. Penitentiary, Atlanta, Georgia, reflects he has been diagnosed as a chronic character disorder, psychopathic personality, disorganized, not psychotic."

Even if we assume that this lay witness was competent to review a medical file and correctly report what it reflects, we are given no information whatsoever as to the qualifications of the diagnostician, the extent of his examination, or the facts upon which the diagnosis was based. A judgment based on such evidence, in the context of this hearing, is also subject to the criticism that laymen, without expert psychiatric opinion should not attempt to draw inferences from such evidence, cf. dissenting opinion of Judge Bazelon in Bishop v. United States, 96 U.S.App.D.C. 117, 223 F.2d 582 (1955), reversed and remanded for hear-

---

1. Obviously the right-wrong test had no relevance to the question before the Court in this hearing. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

ing on issue of sanity, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

Again, the Trial Court, after quoting Title 18 U.S.C.A. § 4245, says:

"Under this procedure, petitioner may request an examination by the board of examiners and may request a certification by the Director of the Bureau of Prisons that there is probable cause to believe that he was mentally incompetent at the time he was convicted and sentenced. * * It appears from an examination of the reports of the medical examiners at the United States Penitentiary, Atlanta, Georgia, that they have not found sufficient evidence of insanity to submit and initiate proceedings under Title 18 U.S.C.A. § 4245, et seq., and from the reports as examined it appears that the petitioner was sane at the time he was tried and that he is presently mentally competent. Therefore, it would appear that petitioner is not entitled to relief either under Title 28 U.S.C.A. § 2255 or Title 18 U.S.C.A. § 4245."

 There is no reference anywhere in the record of this hearing, or among the exhibits, to the petitioner's medical record during his current confinement at the Penitentiary except the F.B.I. Agent's statement. We, therefore, must conclude that the Court's findings, quoted above, were based on the F.B.I. Agent's reference thereto on his cross-examination which we have quoted in full. If the Court's reference to 18 U.S. C.A. § 4245 was intended to hold that this section offers an alternative remedy that a prisoner may pursue, we must disagree. Neither is it a prerequisite to relief under 28 U.S.C.A. § 2255. Under the circumstances, the failure of the Director of the Bureau of Prisons to initiate any proceedings under § 4245 cannot be held to support the conclusion that petitioner was competent at his trial in November 1960. See United States v. Cannon, 310 F.2d 841 (2 Cir. 1962).

 We conclude, therefore, that the case should be remanded for a further hearing. Psychiatric opinion that he was competent to stand trial many months before the trial and before the automobile collision which he claims occasioned the loss of memory, is of little relevance to the specific contention of memory loss. Whether or not he was found to be suffering from memory loss when received at the Atlanta Penitentiary and was thereafter successfully treated for it, on the other hand, would be highly relevant. Such information is readily available in his complete medical records in Atlanta and the testimony of, or a current report from, one or more of the physicians who treated him. That line of inquiry, with such a high promise of fruitfulness, should have been pursued, we think.

We do not agree with the petitioner that the testimony of his trial counsel should have been excluded at the post-conviction hearing on the basis of the attorney-client privilege.

We need not now consider whether the assertion that he was incapable of effective communication and cooperation with trial counsel is a waiver of the attorney-client privilege on the ground that the petitioner has flung open the curtain of secrecy which otherwise would conceal his actual communications. Nor need we enter the controversy as to whether such an assertion is always so necessarily an implicit attack upon the competence of trial counsel as to amount to a waiver of the privilege to the extent necessary to enable trial counsel to defend himself and his reputation. See Gunther v. United States, 97 U.S.App. D.C. 254, 230 F.2d 222 (1956); cf. United States v. Wiggins, 184 F.Supp. 673 (D.C.1960); United States v. Bostic, 206 F.Supp. 855 (D.C.1962). We do not here consider the question of waiver on either ground, for the attorney's testimony was well within an established exception to the privilege.

 Communications made in confidence by a client to his attorney are protected by the attorney-client privilege. It is the substance of the communications which is protected, however, not the fact that there have been communications. Excluded from the privilege, also, are

physical characteristics of the client, such as his complexion, his demeanor, his bearing, his sobriety and his dress. Such things are observable by anyone who talked with the client, and there is nothing, in the usual case, to suggest that the client intends his attorney's observations of such matters to be confidential.[2] In short, the privilege protects only the client's confidences, not things which, at the time, are not intended to be held in the breast of the lawyer, even though the attorney-client relation provided the occasion for the lawyer's observation of them. See generally VIII Wigmore, Evidence (McNaughton Revision) § 2306.

■ Here the attorney testified to just such nonconfidential matters. Petitioner, the attorney testified, was responsive, readily supplied the attorney with his version of the facts and the names of other people involved, was logical in his conversation and his reasoning, and appeared to know and understand everything that went on before and during the trial. No mention was made of the substance of any communication by client to attorney; the witness testified only about his client's cooperativeness and awareness.

All of the matters to which the attorney testified are objectively observable particularizations of the client's demeanor and attitude. Made at a time when neither client nor lawyer manifested any reason to suppose they were confidential, they were not within the privilege. Certainly, the client was then making no secret of his capacity, or want of capacity to communicate with his attorney and to cooperate in his defense.

It is suggested that, in these circumstances, adequate cross-examination of attorney-witness might require the petitioner to inquire into the substance of his communications. That is speculative, however. Effective cross-examination need not go so far. And, if difficulty inheres in the situation, it is no more than

if the question were the client's sobriety or inebriety at the time of an otherwise unrelated consultation. If the attorney who testifies his client's hair was blonde when she consulted him had confused her with another client, inquiry as to the substance of the communication might be the only effective means of revealing his confusion, but his testimony is not drawn within the privilege on that account.

We have not heretofore considered this particular question when it was contested, but we have tacitly assumed that the trial attorney may be examined as to such matters, indeed, that the postconviction court should seek such light as the trial attorney can throw upon the question. United States v. Pledger, 301 F.2d 906 (4 Cir. 1962); United States v. Taylor, 303 F.2d 165 (4 Cir. 1962); United States v. McNicholas, 298 F.2d 914 (4 Cir. 1962). Our tacit assumption does not foreclose reconsideration, but after thorough reconsideration in this contested case, we adhere to it.

However, persuasive the highly relevant testimony of the attorney, which we now hold properly received, it does not militate against our conclusion that a further hearing should be held to inquire into the petitioner's medical history, diagnosis, treatment and response after his reception in Atlanta. Medical opinion ought to be sought as to whether one suffering from amnesia may appear reasonably oriented in time and place when discussing recent and present occurrences and whether, under such circumstances, apparent reasonableness may be infected with irrationality. Moreover, if the medical testimony should disclose a history of traumatic injury occasioning memory loss before the trial and a subsequent history of successful treatment for it, it might provide weighty evidence, in the light of which the attorney's testimony ought to be weighed. On the other hand, it may confirm all that the attorney has

---

2. Particular circumstances may alter the rule. If the client reveals to the attorney a physical defect, usually concealed by clothing, which may be relevant to the attorney's representation of him, it well may be a confidential and protected communication.

said. The circumstances, we think, require that this source of information be explored.

The judgment is vacated and the case remanded for further proceedings in accordance with this opinion.

Vacated and remanded.

SOBELOFF, Chief Judge, and J. SPENCER BELL, Circuit Judge (concurring specially).

In full accord with the majority in vacating the judgment and remanding the case, we nevertheless cannot agree that the attorney's testimony was admissible in the proceeding under review, or that it should be admitted in the proceedings to follow.

We agree that an attorney may testify as to "facts observable by anyone," but we refuse to accept the characterization of the lawyer's testimony here as merely reporting "facts observable by anyone." If nothing were involved beyond observations open to anyone, it is doubtful that the attorney would have been called to the stand. His testimony was desired for a purpose more far-reaching. Any expression as to the client's mental competency necessarily embraced more than facts observable by anyone; it comprehended conclusions drawn in the course of an association that is uniquely regarded in the law.

The lawyer's observations were inextricably intertwined with communications which passed between him and his client. It cannot be said that the testimony was confined to nonconfidential matters. This being so, the well-established privilege which protects the client against disclosure was violated.

The fact that a lawyer may be in a position to give enlightening testimony is not itself sufficient reason for relaxing the client's privileges. In many cases the client may have confessed his guilt to the lawyer, who would then be in an excellent position to give effective testimony, but our tradition forbids such disclosure. We know from other areas of the law that often the best evidence is barred from the case for reasons of policy. What more dramatic illustration could there be than Mapp v. Ohio? (367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081).

Consider the practical difficulty that arises when an attorney is permitted to testify on such an issue as the section 2255 hearing presented. The attorney testifies baldly that his client was "cooperative" and mentally competent. No meaningful cross-examination is possible without inquiring what his client said to him and what he said to his client.[1] The client finds himself on the horns of a dilemma: Either he must forego raising the issue of his incapacity or he must surrender the protection of the privilege the law accords him—a choice he should not have to make. The lawyer's conclusory opinion thus stands without possibility of effective challenge.

The new hearing which the court awards the appellant will, therefore, do him little or no good.

The appellant was earlier adjudicated insane by a court of competent jurisdiction. The adjudication has not been upset or revised, and no later medical exam-

1. See Gunther v. United States, 97 U.S. App.D.C. 254, 230 F.2d 222, 223 (1956), where the court said:

"In connection with any such hearing, the following comment is required. At the hearing on competency the lawyer who had been trial counsel for Gunther was called as a witness on behalf of the Government. He was asked whether in his opinion as a layman he felt Gunther was competent to stand trial and to assist him during the course of the trial. We are of the opinion this lawyer could not be called upon to testify upon that matter. If trial counsel in a criminal case could be called by the Government and asked to give an opinion as to the accused's competency and ability to assist in the defense, he could necessarily also be asked for the factual data upon which he premised his opinion. These questions would open to inquiry by the Government the entire relationship between the accused and his counsel. Such revelations would be a violation of the attorney-client privilege and would also invade an accused's right to counsel in the trial of the criminal charge."

ination was made in an attempt to show that the adjudication should no longer stand. The normal procedure of ordering a psychiatric examination to determine mental capacity to stand trial should have been followed before the case proceeded to trial. There was a similar opportunity, which was not grasped, when the section 2255 petition was filed. This would seem imperative when there is a background of confinement in a mental hospital, extensive psychiatric treatment, and a formal finding of a lunacy commission. Instead, the mere opinion testimony of a layman, the man's own lawyer at that, is adduced in the section 2255 hearing to validate the original trial.

The least that the District Court should now do on remand of the case is to order a proper medical inquiry, and the man's lawyer should not be looked to to supply the missing link.

Every impeachment the majority so rightly levels against the testimony given by the FBI agent as to appellant's mental condition, on the ground that the witness was a medically untrained layman, applies with equal force to the testimony of the lawyer, likewise a layman in medical matters. Even worse, the lawyer, called to testify outside his professional sphere, did so against his own client. This not only violates the ordinary rule against the admission of expert testimony from inexpert witnesses,[2] but it also undercuts the purpose and policy of the attorney-client relation. It is a procedure we cannot sanction.

Our brethren find it unnecessary to consider two issues argued before us: (1) whether by merely questioning his mental capacity the client has "flung open the curtain of secrecy," thus waiving the privilege, and (2) whether the client's assertion of his mental incapacity involves an implicit attack on the professional performance of his trial counsel, amounting to waiver of the privilege. However, in light of what we have said above, it is necessary for us to face these questions, if indeed they are not so re-

lated as to constitute a single question. Whether viewed singly or separately, the answer, in our opinion, must be in the negative.

We perceive no possible basis in reason for holding that the appellant has waived his privilege. Waiver of important rights is not lightly presumed, and will be found only upon a clear and compelling showing. Nor in the circumstances of this case can we regard the appellant's questioning his mental capacity to stand trial as in any sense an attack on the lawyer. Cf. Hunt v. Blackburn, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888); Farnsworth v. Sanford, 115 F.2d 375 (5th Cir. 1940), cert. denied, 313 U.S. 586, 61 S.Ct. 1109, 85 L.Ed. 1541 (1941); Cooper v. United States, 5 F.2d 824 (6th Cir. 1925); United States v. Butler, 167 F.Supp. 102 (E.D.Va.1957), affirmed, 260 F.2d 574 (4th Cir. 1958); United States v. Monti, 100 F.Supp. 209 (E.D.N.Y. 1951).

If a lawyer fails to recognize his client's mental deficiencies, no fair-minded person would say that this necessarily involves faithlessness or negligence. It cannot be expected that the lawyer, who is a layman in psychiatric matters, will always appreciate his client's mental limitations. Even if the client has told him a coherent story, it may later prove to be no more than a fantasy. Yet this would not discredit the lawyer in his profession. There are alternative conclusions fairly to be drawn without treating the issue as an attack upon the lawyer, necessitating the destruction of the client's privilege. The lawyer is not called upon to vindicate himself, as, for example, where the client says "My lawyer gave me ineffective representation by failing to advance a defense of alibi." There the lawyer would be permitted to say "I did not raise it because you did not inform me of it and, in fact, you told me that you were at the scene of the crime."

Here, neither the ethics, nor the professional ability, nor the faithfulness of the lawyer has been put in doubt. He is

2. Turner v. American Security and Trust Co., 213 U.S. 257, 260, 29 S.Ct. 420, 53 L.Ed. 788 (1909); McKenzie v. United States, 266 F.2d 524 (10th Cir. 1959).

not accused of giving poor advice, nor is any form of malfeasance or misfeasance attributed to him. Any mild, indirect embarrassment that a lawyer might sense could not outweigh Kendrick's rights. In our case, to the contrary, the attorney indicated that he gave his testimony only because he felt obliged to obey the order of the court.

With the majority, we recognize that the rule of privilege in the attorney-client relation is subject to an exception when the lawyer is attacked. In that case he may defend himself; but the exception should not be interpreted so broadly as to swallow the rule. The door should not be shut tight against all testimony by the lawyer, but neither should the door be lifted off its hinges.