James Joseph **WOOD**

v.

**UNITED STATES of America.**

No. 65–C–10–H.

United States District Court
W. D. Virginia,
Harrisonburg Division.
March 3, 1966.

V. Stephen Bradshaw, Clark, Wilson & Bradshaw, Harrisonburg, Va., for petitioner.

James C. Roberson, Asst. U. S. Atty., Roanoke, Va., for respondent.

MICHIE, District Judge.

Under Title 28 U.S.C.A. § 2255 James Joseph Wood, who was convicted in this Court on September 4, 1964, for five violations of the federal narcotics laws, Title 26 U.S.C.A. § 4705(a), now collaterally attacks the conviction. He is presently serving a five-year sentence at the Medical Center for Federal Prisoners at Springfield, Missouri.

Pursuant to the petitioner's request to proceed in forma pauperis an attorney was appointed to represent him and a hearing was held in the matter on February 8, 1966, in Harrisonburg, Virginia. After consideration of all the evidence, I have concluded that the petition to vacate the sentence must be denied.

The petitioner, in his motion filed with the Court, alleged two grounds for invalidating his conviction: 1) that he was under the influence of narcotics and did not clearly know what was going on at his trial, and 2) that new evidence would show that a witness against him testified falsely and "framed" him. No evidence whatsoever was offered by the petitioner to support his second contention, although the opportunity was presented, and I find from the lack of evidence that the petitioner is not entitled to a vacation of his sentence on this ground.

The petitioner's real attack upon his conviction is his contention that the amount of narcotics which he had voluntarily consumed during the course of the two days of his trial made it impossible for him effectively to assist his attorneys in his defense.

The facts as developed by the petitioner show that he has suffered with progressive Buerger's disease for the past twenty years. The disease caused the loss of the petitioner's legs in 1950 and 1951. Because of the severe pain attendant upon the disease, the petitioner had,

since 1952, taken narcotics prescribed by his doctor. The evidence shows that he had been addicted to drugs since that time.[1] The original dosage of narcotics, in 1952, was ½ grain of codeine and ¼ grain of morphine five or six times a day as needed for pain. This had gradually been increased thereafter. By April of 1964 the petitioner had been taken off morphine and codeine and given instead other drugs, including dolophine.[2] He had been taking dolophine alone for the three or four weeks immediately preceding his trial on September 3 and 4, 1964. At the time of his trial, the petitioner testified, his average daily dosage of dolophine was between fifteen and twenty ccs. per day, self-administered with a syringe in the muscle of his arm in shots, usually of one or two ccs. per dose. This amount of narcotics apparently allowed the petitioner to function normally throughout the day.

On the morning of September 3, 1964, the first day of his trial, the petitioner testified that he arose between 6:30 and 7:00 a. m. His nerves were upset and the pain from his illness was more severe than usual. For this reason he took, in the time interval between arising and leaving his home in Strasburg, Virginia at approximately 8:00 a. m., 40 ccs. of dolophine. He further testified that he took an additional 10 ccs. in his car on the way to court in Harrisonburg between 8:00 and 9:00 a. m., and still another 10 ccs. during the noon recess of the court, for a total of 60 ccs. of dolophine between 6:30 a. m. and the early afternoon of September 3.

On the second day of his trial, the petitioner testified, he took another 40 ccs. of the drug between arising and leaving for court at about 8:00 a. m.

The petitioner maintains that the effect of these alleged overdoses of drugs was to make him "dazed." He testified

---

1. Subsequent to his conviction the petitioner was taken off narcotics entirely by the federal prison authorities and he is no longer addicted.

2. Dolophine, according to the testimony, is a trade-marked name for methadone hydrochloride, a synthetic narcotic having the same uses and essentially the same effect as morphine.

that he doesn't "remember everything right" and that he felt like he was "drunk or stupid or something." In one specific detail, he remembers trying to draw a diagram of his house for the benefit of the Court and jury, and that he "couldn't get it right." He recalls testifying but says the entire affair appears fuzzy to him.

Corroboration for the petitioner's assertions rests upon the testimony of the petitioner's wife and of three individuals who were employed by the petitioner at the time of his trial. The petitioner's wife, Mrs. Allie Bet Wood, testified that she gave her husband two bottles of dolophine [3] on the morning of September 3 and that she saw the same empty bottles before she and her husband left for court. She gave the petitioner an additional bottle to take with him to court and she saw this bottle empty that night. She recalls seeing him take shots at the luncheon recess that day. On the morning of the second day, September 4, she gave her husband an additional two bottles which were again used before leaving home for court. She had never seen her husband take two bottles of the drug at one time before. On the way from their home to court she recalls that her husband was uncommunicative, that he just mumbled and did not make sense.

Perry Pultz, a young man who was employed by the petitioner and who had lived with the Woods for six years prior to the trial, accompanied them to court on both days. He described the petitioner as "sleepy and drunk" and "droopy and sick looking" before leaving his house to come to court. Wood, according to the testimony, normally had an extremely outgoing and jovial personality.

Thomas William Funk, also employed by the petitioner at the time of trial, accompanied Wood to court on the morning of the first day. In talking to Wood on the way to court he noticed that the petitioner did not respond to questions as he usually did and that he had nothing much to say. Funk saw Wood take a shot at his house and on the way to court.

Charles Franklin Funk, brother to Thomas Funk and another employee of the petitioner, accompanied Wood to court the first morning and noticed that he acted sleepy or drunk. Funk recalls seeing Wood take his needle out twice before leaving home and once in the car. He noticed no difference in the petitioner before or after taking a shot.

Assuming the amount of dolophine that the petitioner testified he took on September 3 and 4 and the time period in which he took it, Dr. Robert Bryant, a physician practicing in Harrisonburg, testified that a man of the petitioner's physical characteristics and narcotic history would very likely be in a euphoric condition and that he might not care as much about what went on about him. He would not be up to his usual mental state and would not be able to defend himself as well as he would otherwise in the face of adverse statements and conditions. He felt that there would be symptoms of overdosage of medication—confusion, sleepiness, droopiness, muscular lack of coordination. In response to cross-examination Dr. Bryant testified that the petitioner "might well not" have a "sufficient amount of mental ability to consult with his lawyers with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings."

The foregoing summarizes the evidence most favorable to the petitioner. On the other hand, the Government presented the expert testimony of Dr. Straty H. Economon, a physician specializing as a psychiatrist at St. Elizabeth's Hospital in Washington, D. C. Dr. Economon is a staff psychiatrist at St. Elizabeth's and regularly engages in research and clinical work in narcotics addiction and the metabolism of narcotic drugs. His subspecialty is forensic psychiatry and he regularly works with individuals sent to his hospital for mental examinations by the courts. Unlike the petitioner's expert

---

3. The bottles involved each contained 20 ccs. of the drug.

witness, who testified that he had personally treated only about five narcotics addicts, this physician has treated or examined several hundred addicts and he is presently engaged in this type of work. Part of his regular duties entails testifying in the District Court for the District of Columbia as to the mental status of defendants.

Dr. Economon's testimony directly contradicts the opinion of Dr. Bryant. In Dr. Economon's opinion, the petitioner could have consulted with his lawyers with a reasonable degree of rational understanding and would have had a rational and factual understanding of the proceedings against him. Assuming the amount of narcotics the petitioner testified he took under the attendant circumstances, Dr. Economon testified that the petitioner would have been helped rather than hindered in defending himself. The petitioner regularly consumed 20 ccs. of dolophine per day, 10 times the maximum therapeutic dosage which will relieve pain in the average individual. His habituation had developed in him a chronic tolerance for dolophine, and, since there is a cross-tolerance between morphine and dolophine, this tolerance had been present over the long period of time before the petitioner was switched from morphine to dolophine by his doctor. Secondly, the petitioner, a large man weighing 250 pounds, would be able to metabolize more drugs than a smaller individual. The petitioner, who took injections in the muscle of his arm, would have been able to handle tremendous amounts of the drug in view of the size and strength of his arms,[4] with large amounts of fatty tissue. Finally, Dr. Economon reasoned that the petitioner needed a larger amount of drugs on the days of his trial due to his increased anxiety and fear. A drug addict can tolerate more than his usual amount of narcotics if his dependence is greater on a particular occasion, and dependence increases with anxiety and fear. Faced with a possible 25 year sentence on the narcotics charges, the petitioner would have had an acute tolerance allowing him to handle three times his usual intake of narcotics. Under the circumstances, Dr. Economon felt that the petitioner *needed* three times his usual intake.

Dr. Economon reasoned that any adverse effects which the petitioner might have experienced from taking a larger-than-usual dosage of dolophine would have occurred shortly after the largest amounts of the drug, 40 ccs., were consumed. Since Wood testified that this amount was taken both mornings before leaving home, adverse reaction would have occurred at home or in the car on the way to court. A narcotics addict, according to the testimony, after taking an intravenous[5] injection, may experience a "flash" lasting from 30 seconds up to ten minutes during which time he will be what is commonly referred to as "on the nod." During this time he is totally uncommunicative and quite incompetent and, as the term implies, he will be in a semi-conscious or unconscious state. Following this "flash" the addict is then all right for a variable period of from three to six hours. Thus, in the present case, the petitioner would have been quite competent during the hours of his trial, although the expert suggested that he would probably have felt the need for an additional shot on the afternoon of the second day.[6]

Finally, Dr. Economon (unlike Dr. Bryant who testified that an addict suffering from an overdose of dolophine

4. The petitioner testified that his arms are quite strong, partly as a result of his increased dependence upon them after the loss of his legs.

5. Wood testified that he never took shots intravenously, but rather in the muscle of his arm. From the expert testimony, this apparently would mean that the in-

itial reaction would be less pronounced and the addict could more easily "handle" the injection.

6. The petitioner, however, testified that he never suffered any withdrawal symptoms prior to the time, after his conviction, when he was incarcerated and taken off narcotics entirely.

might well escape detection in a courtroom because of the lack of any clearcut physical indicia of euphoria or depression induced by the drug) felt that an addict genuinely suffering from a narcotic overdose would have been extremely noticeable. He would have been asleep, lethargic, stuporous or sick, and he would not have known what was going on. Based on his reading of the transcript of the petitioner's testimony at the trial, Dr. Economon felt that only a competent person could have testified as Wood did at the trial and that the petitioner could not possibly have been in a state of overdose.

To this expert's testimony must be added the Court's own recollection of the proceedings and the testimony of three witnesses [7] present at the petitioner's trial. The Court recalls nothing particularly unusual about the petitioner's demeanor on the two days of his trial. He testified coherently and on a level which one might expect of a reasonably intelligent, though uneducated, man. A perusal of the transcript supports the Court's recollection of the petitioner's testimony.

The three witnesses for the government included the Assistant United States Attorney who prosecuted Mr. Wood and the deputy marshal who had previously arrested him and who took the petitioner into custody immediately following his conviction. Both of these witnesses were in a position to observe the petitioner and both testified that they observed nothing unusual about Wood at the trial. The third government witness, Malcolm M. Mayo, is a former narcotics agent with the Department of the Treasury and testified at Wood's trial. During the course of the trial Mayo was seated at the prosecutor's table across from the petitioner. Mayo testified that he had had a great deal of practical experience with drug addicts and had talked with between 100–

300 of them. While he did not converse with Wood during the trial, he observed that the petitioner took great interest in the proceedings, talked with his attorneys, and answered questions very reasonably. Wood did not appear to be drowsy.

The petitioner's own testimony at this hearing refutes his contentions in the mind of the Court. On cross-examination Wood was able to reconstruct the events of the two days of his trial with graphic certainty. He recalled exactly who accompanied him to court on the two mornings of the trial, including the positions they occupied in the car; he definitely recalled that he had lunch on the first day of his trial but not on the second, and he was able to correct an erroneous assumption of the Assistant United States Attorney with respect to this fact; he recalled numerous other details of the trip to court, but he maintains that his mind suddenly fogged when he entered the courtroom. In one detail of the trial, however, he had excellent recall. Wood had testified on direct examination, in support of his contention that he was mentally incompetent at his trial, that he was unable at the trial to construct a diagram of his home for the benefit of court and jury because of his mental condition. However, on cross-examination he was able to explain with ease his purpose for constructing the diagram, i. e., to prove that his daughter would have been able to see from the kitchen of his home into his living room to support his contention that she saw federal narcotics agents attempt, unsuccessfully, to give Wood money for narcotics.

It is of course possible that the petitioner could have been in a euphoric condition during his trial, or part of it, and still have excellent recall of the events of the two days. His ability to act could have been affected even though he knew

---

7. The Court does not credit the testimony of a fourth government witness who stated that the petitioner was alert at the trial and recalled Wood giving a vivid description of how to get to a sawmill which he operated at the time. The transcript shows that Perry Pultz, not the petitioner, described the location of the sawmill.

what was going on and could recall it 17 months later. Upon all the evidence, however, I am unconvinced that this is the case.

The petitioner was represented at his trial by two able and dedicated counsel. His lawyers were privately retained rather than court-appointed. One of the attorneys had represented him previously and Wood had consulted with her several times prior to his trial on the narcotics charges. It is quite unlikely that the petitioner could have been in the state he claims to have been in without this coming to the attention of his counsel. And it is certain in the mind of the Court that these attorneys would have brought the situation to the Court's attention had they known that Wood was suffering from an overdose of drugs. It is not insignificant that these attorneys were not called as witnesses by the petitioner, although one of them lives within 35 miles of the place of hearing.[8] The petitioner's attorneys are the individuals, above all others, who would of necessity have known the mental state of the petitioner during his trial, and the Court could place the highest degree of credence in their testimony. The petitioner instead has placed his reliance on his own self-serving testimony and that of his wife. The three other witnesses who testified for the petitioner are former employees, and one of them previously resided with him. All three have little or no education and, unlike the petitioner, appear to be of relatively low intelligence. Under the circumstances, the Court finds little of probative value in their testimony.

■ The standard to be applied in determining whether a defendant who is using narcotics may constitutionally be required to stand trial has not been defined with exactitude by the federal courts. There appears to be no authority for a rule which would *per se* render a defendant who is using narcotics incom-

petent to stand trial. See United States v. Tom, 340 F.2d 127 (2d Cir. 1965). Common sense dictates that the standard should be the same as that utilized for the determination of alleged mental incompetency induced by other causes. The Supreme Court has defined the standard as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (standard to be applied under 18 U.S.C.A. § 4244 providing for the determination of mental incompetency after arrest and before trial). As the preceding discussion has shown, this is exactly the standard which the Assistant United States Attorney utilized in this case in framing his hypothetical questions. A similar standard was approved by the court in United States v. Tom, supra (by implication), where an identical claim of incompetency induced by narcotics was unsuccessfully maintained. And see Cruz Rivera v. United States, 341 F.2d 746, 747 (1st Cir. 1965) (unlikely that petitioner "would not have understood the nature and consequences of the offense, and of a plea of guilty"); Johnston v. United States, 292 F.2d 51, 53 (10th Cir. 1961) (narcotics did not prevent petitioner "from participating fully in his defense").

Counsel for the petitioner have argued that the standard should be whether the petitioner was "as competent as he would have been had he not been under the influence of narcotics." The meaning of the phrase "under the influence" is unclear, but insofar as it implies a lesser requirement for showing incompetency than the foregoing cases indicate I believe such a standard would be erroneous. In a sense any user of narcotics is "under the influence" of the drug if it affects

---

8. The Government elected not to call the petitioner's former attorneys in deference to the minority viewpoint on the question of attorney-client privilege expressed in United States v. Kendrick, 331 F.2d 110 (4th Cir. 1964).

him at all. It would be impossible to determine whether this petitioner would have been more competent on the days of his trial if he had never begun taking narcotics in the first place. At the time of his trial he was a regular user of drugs, addicted to them. As the evidence shows, he needed drugs to feel "complete" and he would have suffered from withdrawal had he not continued to take them throughout his trial. At the time of his trial, therefore, his normal level of competency was one accompanied by the use of a certain amount of narcotics. He took more than his usual amount of drugs on the two days of the trial, but, again, expert testimony maintained that he needed more on those days. Whether the petitioner's "need" was greater or not, however, I do not believe that due process requires a test so subjective as to attempt to establish the amount of drug intake at which the petitioner would have been at his highest performance level. Such a test, logically extended, would require that every defendant be in the best mental state possible for that defendant on a given date. Due process requires, I believe, only the more objective standard outlined in the cited cases.

■ The petitioner had the burden of proving his asserted mental incompetency at the time of trial, United States v. Tom, supra; Johnston v. United States, supra, and this factual burden was a heavy one. Cruz Rivera v. United States, supra. I conclude that he has not carried his burden of proof. His petition must accordingly be denied.

This opinion and the findings and authorities set forth as herein stated will be treated as findings of fact and conclusions of law and, based upon the opinion, an appropriate order will be entered and filed.

The Court is grateful to the petitioner's assigned counsel, V. Stephen Bradshaw, Esq., and to John Paul, Esq., who ably assisted him, for their industry and their thorough and competent representation of the petitioner herein.