James David RAULERSON, Petitioner,

v.

Louie L. WAINWRIGHT, Secretary, Department of Corrections, State of Florida, Respondent.

No. 79–267–Civ–J–WC.

United States District Court, M. D. Florida, Jacksonville Division.

May 9, 1980.

On Petition for Rehearing June 24, 1980.

David J. Busch, Asst. Public Defender, Second Judicial Circuit, Tallahassee, Fla., for petitioner and James David Raulerson, pro se.

Carolyn Snurkowski, Asst. Atty. Gen., Tallahassee, Fla., Ralph N. Greene, III, Asst. State Atty., Jacksonville, Fla., Secretary of the Florida Dept. of Corrections, Tallahassee, Fla., Superintendent, Florida State Prison, Starke, Fla., Jim Smith, Atty. Gen., State of Florida, Robert Graham, Governor, State of Florida, Tallahassee, Fla., for respondent.

## ORDER

CASTAGNA, District Judge.

James David Raulerson, an inmate at Florida State Prison in Starke, Florida, pe-

titions this Court pursuant to 28 U.S.C. § 2254 to issue a Writ of Habeas Corpus that would invalidate the death sentence imposed upon him on August 20, 1975, by the Circuit Court in and for Duval County, Florida.

## Statement of the Case

On April 27, 1975, in the aftermath of a rape and robbery committed by Petitioner at a Jacksonville restaurant, Officer Michael David Stewart was shot and killed. Petitioner was convicted of the first degree murder of that police officer by a jury in August, 1975. At the penalty phase of his trial on August 7, 1975, a majority of the jury recommended that Petitioner be sentenced to death. The trial judge ordered a presentence investigation report of Petitioner. The judge expressly relied upon that report, at least in part, in sentencing Petitioner to death on August 20, 1975. At the sentencing hearing, the trial court filed written findings of fact in justification for its imposition of the death sentence.

Petitioner's conviction and sentence were affirmed on direct appeal to the Supreme Court of Florida. *Raulerson v. State*, 358 So.2d 826 (Fla.1978). Among other issues, Petitioner argued that he was denied due process of law pursuant to the United States Supreme Court's opinion in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) because he was not shown or made aware of the contents of the presentence investigation report prior to his sentencing. 358 So.2d at 831–32.

Raulerson filed his Petition for Writ of Habeas Corpus in this Court on March 23, 1979. Both parties agreed that an evidentiary hearing was not necessary. Respondent filed a Motion to Expedite consideration of the Petition on the same day that the Governor of Florida signed a Warrant directing that Petitioner be executed between May 16 and May 23, 1980. Subsequently, on April 24, 1980, Petitioner filed an Application for Stay of Execution pending final disposition of this cause. This Court granted Respondent's Motion to Expedite on April 28, 1980.

## Issues for Consideration

Petitioner asserts that he was denied due process of law because the trial court expressly relied in part on information contained in the presentence investigation report in making its sentencing decision when the information contained in that report was not shown or otherwise made known to Petitioner prior to his sentencing, in violation of the principles announced in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Petitioner also raises an equal protection of law argument, claiming that the holdings of the Supreme Court of Florida in *Raulerson v. State*, 358 So.2d 826 (Fla.1978) and *Funchess v. State*, 367 So.2d 1007 (Fla.1979) reach opposite conclusions on the same *Gardner*-related due process issue.

## Findings of Fact

Upon review of the record, this Court finds that: (1) The trial court relied in part on information contained in the presentence investigation report in its sentencing decision. (2) Although Petitioner's counsel did receive and review the presentence investigation report, the record fails to show that Petitioner either received or reviewed, independently or with counsel, that report prior to his sentencing on August 20, 1975. (3) Petitioner, by affidavit, asserts that only after his sentencing did he learn of certain of the factual allegations contained in the report which he asserts are untrue.

The relevant part of the transcript of the sentencing hearing on August 20, 1975 is reproduced below:

THE COURT: Do you, or anyone on your behalf, have any legal cause to show why sentence should not be pronounced?

MR. STEDEFORD: No legal cause at this time, Your Honor.

THE COURT: Is there anything further in mitigation or aggravation?

MR. STEDEFORD: Your Honor, I talked with Mr. Raulerson about the matter earlier. Anything he might say, we realize, of course, that you have the Presentence Investigation Report that you

have provided to me. I have gone over it, I know that you have.

THE COURT: Mr. Stedeford, I requested my secretary to give you two copies of that so Mr. Raulerson may have one also.

MR. STEDEFORD: *I have not given him his copy. I received a second copy earlier just a few moments ago, but I will give him one at the conclusion of this hearing.*

Your Honor, Mr. Raulerson and I did discuss what mitigation we might bring before the Court. We, frankly, feel as though it would do little good to talk of mitigation in this case, and we feel as though you have considered it, and that Mr. Raulerson and I both concur that anything we might say would not change what you might be doing today.

At this time, Your Honor, there's nothing further to say in mitigation.

THE COURT: Does the State have anything further in aggravation?

MR. GREENE: Nothing, Your Honor, other than the comments that the State, of course, made and brought—and put into evidence at the sentencing phase of the trial.

THE COURT: Thank you, gentlemen. (Whereupon, the Court proceeded to sentence the Defendant.) (emphasis supplied)

Respondent asserts that Petitioner's trial counsel represented at the August 20, 1975 hearing that he had discussed the contents of the presentence investigation report with Petitioner prior to the sentencing hearing. If so, such discussion is not disclosed in this record. The record reflects only that Petitioner's trial counsel had discussed with Petitioner the "matter" of mitigation or aggravation and "what mitigation we might bring before the Court" (see transcript above). While this may be close, the unique nature of the death penalty precludes its imposition on less than clear and unequivocal compliance with all procedural requisites. There is no positive allegation in the transcript or any substantial indication in the record as a whole that Petitioner and

counsel discussed the contents of the presentence investigation report prior to Petitioner's August 20, 1975 sentencing hearing or that Petitioner was otherwise aware of the contents of that report prior to his sentencing. In an August 22, 1977 affidavit Petitioner stated that he:

"... did not review the presentence investigation report with my attorney, Walter R. Stedeford, prior to my being sentenced."

Petitioner's trial counsel, Mr. Stedeford, stated in a June 2, 1977 letter to Petitioner's appellate counsel:

"I cannot state as a fact that I reviewed the presentence investigative report with Mr. Raulerson and questioned him concerning the accuracy of the allegations."

(4) The trial court's written findings of fact were furnished to Petitioner and his trial attorney immediately prior to the trial court's pronouncement of sentence.

### Conclusions of Law
#### 1. *Due Process*

In *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the United States Supreme Court confronted a situation in which Petitioner Gardner had been convicted of first degree murder in a Florida court. The judge based his imposition of the death penalty, in part, on information provided in a presentence investigation report. The presentence investigation report contained a confidential section which was not disclosed to Defendant or counsel. Defense counsel had apparently received a copy of the nonconfidential part of the report, but did not request disclosure of the full report. The judge did not comment on the information from the undisclosed part of the report. That undisclosed section was not in the record on appeal to the Florida supreme court, which affirmed Gardner's conviction and sentence. *Gardner v. State*, 313 So.2d 675, 677 (Fla.1975) (Ervin, Boyd, JJ., concurring in part and dissenting in part).

The United States Supreme Court granted certiorari and reversed the decision of the Florida supreme court. Initially, the

Supreme Court distinguished *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), in which the Court had affirmed the conviction and death sentence of an appellant who had been sentenced, at least in part, on the basis of information provided in an undisclosed presentence investigation report. The *Gardner* Court recognized that the material facts about the appellant in *Williams* which were in the report "were described in detail by the trial judge in open court." 430 U.S. at 356, 97 S.Ct. at 1203. The *Gardner* Court also noted that "the passage of time justifies a re-examination of capital-sentencing procedures ... against evolving standards of procedural fairness in a civilized society." *Id.* at 357, 97 S.Ct. at 1204 (footnote omitted). Thus, the Court stated:

> (D)eath is a different kind of punishment from any other which may be imposed in this country.... From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.
>
> \*     \*     \*     \*     \*     \*
>
> (I)t is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause.

*Id.* at 357–58, 97 S.Ct. at 1204–05 (citations omitted).

Recognizing that "(t)he defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence," *id.* at 358, 97 S.Ct. at 1204, the Court concluded:

> (P)etitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of

information which he had no opportunity to deny or explain.

*Id.* at 362, 97 S.Ct. at 1206.

■  Counsel for Respondent seeks to urge upon this Court as a distinction between this case and *Gardner*, that in *Gardner* the report was not furnished to defense counsel and that by its reference to that fact, *Gardner* is so limited; that is to say, since in this case the report was furnished to defense counsel, no more is required, even by *Gardner*. Obviously, if counsel did not review the report with Petitioner, counsel would have no way of knowing whether Petitioner had any corrections, additions or deletions to make to the report. That knowledge is peculiarly in Petitioner himself and "the defendant has a constitutional right to know and to test the accuracy of any statement in the presentence report upon which the sentencing judge relies." *United States v. Woody*, 567 F.2d 1353, 1361 (5th Cir.), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2241, 56 L.Ed.2d 406 (1978). That right is the right of Petitioner as well as his counsel. Petitioner must be given the opportunity to rebut and deny any portion of the report and such opportunity clearly requires personal knowledge of the information to be rebutted. Both the "appearance and reality of due process" must exist in a sentencing proceeding. *United States v. Espinoza*, 481 F.2d 553, 558 (5th Cir. 1973). Mr. Justice Brennan in his separate opinion in *Gardner* stated the matter simply:

> (T)he Due Process Clause of the Fourteenth Amendment is violated when a defendant facing a death sentence is not informed of the contents of a presentence investigation report made to the sentencing judge.

430 U.S. at 364, 97 S.Ct. at 1207 (Brennan, J.).

Finally, this Court finds that Petitioner did not waive his constitutional right to be informed of the contents of the presentence investigation report. As in *Gardner*, "there is no basis for presuming that the defendant himself made a knowing and intelligent waiver" of the constitutional error reflected in the record before this Court. *Id.* at 361,

97 S.Ct. at 1206. *See also Smith v. Estelle,* 602 F.2d 694, 701 n.8. (5th Cir. 1979), *cert. granted,* 445 U.S. 926, 100 S.Ct. 1311, 63 L.Ed.2d 758 (1980).

### 2. *Equal Protection*

This Court expressly refrains from consideration of the merits of Petitioner's equal protection issue because the due process of law claim requires the granting of the requested relief. Petitioner and Respondent agree, as does the Court, that the due process and equal protection issues are properly before the Court with respect to the exhaustion doctrine articulated by the United States Court of Appeals for the Fifth Circuit in *Galtieri v. Wainwright,* 582 F.2d 348 (5th Cir. 1978) (en banc).

It is therefore,

ORDERED:

1. The Application for Stay of Execution is granted and Petitioner's execution is stayed. The Judgment of Commitment and sentence of death imposed by the State is held to be ineffective and void and any process, order or warrant issued by any judicial or executive officer purportedly in enforcement of such judgment and sentence is likewise held to be ineffective and void.

2. The Petition for Writ of Habeas Corpus is granted, however Petitioner shall remain in the custody of the Superintendent of the Florida State Prison. The State of Florida shall have sixty days within which to afford to Petitioner a new sentencing hearing and imposition of sentence, without the necessity of an advisory jury, providing for Petitioner, his counsel and counsel for the State full opportunity to be heard regarding the content of the presentence investigation report, as well as other matters properly considered by the trial court concerning Petitioner's sentence; absent such hearing without good cause, Respondent shall release Petitioner from custody.

3. A certified copy of this Order be immediately served by United States Marshal upon the Secretary of the Florida Department of Corrections; the Superintendent of the Florida State Prison; Honorable Jim Smith, Attorney General of the State of Florida and Robert Graham, Governor of the State of Florida.

### ORDER

#### On Petition for Rehearing

This cause has been considered by the Court on Respondent's Petition for Rehearing. The office of the State Attorney for the Fourth Judicial Circuit of Florida has appeared in the case as counsel of record for the Respondent. Subsequent to the filing of the Petition for Rehearing and while the Petition was still pending, counsel submitted an article to the Florida *Times Union* which article was published on May 30, 1980, a copy of which is attached and made a part hereof. Objection to rulings or decisions of the Court are more properly handled by inclusion in a petition for rehearing or by appeal. The Court cannot rule on matters not set out in the pleadings or motions.

The language on page 2 of the Memorandum in Support of the Petition for Rehearing, stating that Petitioner's limited claim is that he did not receive a copy of the PSI report, fails to recognize the proper scope of the Petitioner's claim and the Court's ruling thereon. Petitioner's claim is not limited to failure to receive a copy of the report; it includes the claim which the Court found to be valid that the Petitioner was never informed of the contents of the presentence investigation report before sentencing either by receipt of a copy, discussion with counsel or otherwise.

The Supreme Court of the United States in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), held that the sentencing process as well as the trial itself must satisfy the requirements of the Due Process Clause, and went on to vacate the death sentence of Gardner because of its conclusion that the Due Process Clause of the Fourteenth Amendment is violated when a defendant facing a death sentence is not informed of the contents of a presentence investigation report.

Counsel for Respondent has suggested that Petitioner's attorney did discuss the

presentence report with the Petitioner. If so, it was the responsibility of counsel to make such discussion clearly appear in the record at the time of sentencing. It did not so appear.

■ It is well established that before a Rule 59 new trial or rehearing is granted on the basis of "newly discovered evidence," such evidence must have been in existence prior to the Court's disposition of the case and it must be made to appear that even by the continuous exercise of due diligence the evidence could not have been presented at the first hearing. Furthermore, the evidence must be material and not cumulative or impeaching, and it must be of such weight or importance as to require a different result. *See e. g., N.L.R.B. v. Jacob E. Decker and Sons,* 569 F.2d 357, 363–64 (5th Cir. 1978) and cases cited therein.

Respondent contends that because of the attorney-client privilege, the trial attorney was precluded from providing this information until the privilege was waived through Petitioner's action in alleging that he had inadequate representation. Although resting on a generally sound principle, such an argument in this case is frivolous and totally without merit. The same trial attorney, on June 2, 1977, in response to a May 26, 1977 letter from Petitioner's appellate counsel, furnished a letter in which trial counsel alleged that he was unable to state as a fact that he reviewed the presentence investigation report with Petitioner. The attorney-client privilege on the subject of communications and actions between Petitioner and his trial counsel regarding the PSI report was clearly waived at the time that the June 2 letter was made a part of the record. Although Respondent had full opportunity to review the matter with such trial counsel thereafter, there is no showing of any diligent attempt by Respondent to further investigate this circumstance prior to May 1, 1980. The Respondent alleges that the Petitioner considered the attorney-client relationship intact as late as May 1, 1980. The attorney-client relationship is not amenable to such manipulation. If such a position was in fact taken by Petitioner, it could not reverse the waiver of confidentiality effected by the publication and use by Petitioner of the letter of June 2, 1977.

Respondent cites *United States v. Woodall,* 438 F.2d 1317 (5th Cir. 1970), *cert. denied,* 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971) to support its argument that the attorney-client privilege is breached by a defendant's attack on the effectiveness of his counsel. This is, of course, true. However, it is not the only way in which the attorney-client privilege may be waived. Petitioner's affidavit that "he did not review the PSI report" with his trial attorney prior to sentencing and his trial attorney's letter of June 2, 1977 are explicit waivers of the privilege regarding communication between attorney and client as to the PSI report and its contents. *United States v. Woodall, supra* at 1324–25. Furthermore, if the act of communication is at issue, as opposed to the substance of any such communication about the presentence investigation report, there is a serious question whether the privilege is applicable at all. *See e. g., Clanton v. United States,* 488 F.2d 1069 (5th Cir.), *rehearing en banc denied,* 490 F.2d 992, *cert. denied,* 419 U.S. 877, 95 S.Ct. 140, 42 L.Ed.2d 116 (1974), *quoting with approval United States v. Kendrick,* 331 F.2d 110, 113–14 (4th Cir. 1964).

The alleged "newly discovered" evidence is not newly discovered at all; it is simply newly concluded, and while it is clear that on the issue of due diligence alone this Petition for Rehearing should be denied, the Court observes that the evidence allegedly newly-discovered by Respondent is not of such weight or importance as to require a different result in this case, nor does it raise an issue of fact to be resolved on rehearing. Mr. Stedeford's late affidavit reveals that even after reviewing the entire trial transcript, he still does not state as a fact that he reviewed the presentence report with the Petitioner prior to imposition of sentence but states that it is his present "opinion and belief" that he did so. This is simply controverted evidence in conflict with his own letter of June 2, 1977 and with the Petitioner's affidavit to the contrary.

Respondent contends that the trial court did not use any of the information contained in the presentence investigation report in the written findings of fact to support the imposition of the death penalty. This contention is summarily disposed of to the contrary by the statement of the trial judge in the findings of fact that such findings "are based upon the record before this Court including ... the presentence investigation report furnished to this Court by the Florida Probation and Parole Commission."

█ Finally, Respondent claims that this Court has "inappropriately overlooked" *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), contending that because Petitioner failed to object to the procedure in the trial court, he waived the right to do so and may not now raise the due process issue before this Court; however, since there is no showing that the State raised the issue of waiver in the Flori-da supreme court and the Florida supreme court nevertheless ruled on the merits of the case, the due process issue was still open for consideration by this Court. *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 147–54, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777 (1979); *Moran v. Estelle*, 607 F.2d 1140, 1141–43 (5th Cir. 1979).

The remaining contentions of Respondent are merely argumentative and present no basis for rehearing. Respondent having shown no basis upon which the Court should grant a rehearing, it is hereupon

ORDERED:

1. That Respondent's Petition for Rehearing is denied without argument.

2. That Respondent's Motion to Stay Proceedings is granted to the extent that the Order of this Court of May 9, 1980 is amended by extending the time for compliance with the provisions of Paragraph 2 thereof to and including July 25, 1980.

## APPENDIX

The Florida Times-Union, Jacksonville, Friday, May 30, 1980      ***A-11

# Prosecutor calls for curbs on federal courts
### Austin cites Raulerson death stay as example of flaws in system
#### By ED AUSTIN
#### State attorney, 4th Circuit

Murderer and professional robber James David Raulerson, and Jerry Tant, a 6-foot-6-inch, 260-pound giant, stormed across the Southeast on a violent, criminal rampage in early 1975.

During April, the pair robbed a grocery store and several restaurants in Alabama, then struck Florida. On April 26, 1975, they robbed the Brown Derby Restaurant in Tallahassee.

The next night they assaulted the Sailmaker Restaurant in Jacksonville.

---
### Point of view
---

The robbers always wore ski masks, carried handguns and hit businesses at opening or closing hour. Phones were ripped out and employees were threatened, terrorized and forced to lie face-down on the floor as the offenders escaped with the cash receipts.

In Jacksonville, Raulerson added a vicious, new twist to their "method" by raping and brutalizing a young schoolteacher working part-time at the restaurant.

But the Sailmaker robbery, discovered in progress, was reported to police. Even as Tant and Raulerson robbed and raped, Jacksonville sheriff's officers raced to the scene.

Arriving first, two young deputies, Mike Stewart and Jim English, suddenly faced Tant's gun as he burst out the door. English and Stewart fired at short range. Tant died in the exchange.

Alerted by the gunshots, Raulerson deserted his rape victim and ran; almost headlong into the deputies. He fired first at English then wheeled and shot Stewart.

He emptied his loaded revolver at the officers.

English was saved when a direct hit to the chest was deflected by a common, ballpoint pen. Mike Stewart, shot through the heart from just 10 feet away, died instantly.

In those few seconds, other police arrived and Raulerson, captured at the scene, has lived in jails ever since.

Indicted by the Duval County Grand Jury two weeks later in the murder-rape-robbery episode, Raulerson was found guilty as charged, by a trial jury, on Aug. 5, 1975. Evidence of guilt was overwhelming.

Florida law requires certain well-defined aggravating and mitigating factors be considered by juries and judges considering the death penalty. The defendant's criminal history, age, mental competency, the nature of the crime and several other matters are considered by the jury and the judge.

The trial jury, in a separate proceeding, recommended the death penalty for Raulerson.

Presiding Judge Susan Black ordered the Parole and Probation Commission to investigate Raulerson's background before sentencing. A 10-page report, including four pages classified "confidential," was delivered well before sentencing day.

Though the law did not then require release of the confidential section, Judge Black, with good foresight, provided the entire document to the defense and the state. She subsequently affirmed this act in writing to the Supreme Court.

With this pre-sentence investigation report in hand, but chiefly relying on her knowledge of the case, Judge Black found none of the seven possible mitigating factors present. She found six of the aggravating factors did exist.

Under the law and facts of the case, death was clearly the appropriate sentence.

On Aug. 20, 1975, Judge Black, concurring with the jury's recommendation, sentenced Raulerson to death.

A common sense reading of both the pre-sentence investigation report and Judge Black's sentencing order shows all the factors she relied upon were brought out at the trial. In fact, the record shows the pre-sentence report was totally irrelevant to sentencing procedures in this case.

Raulerson had ample opportunity to rebut every item included in Judge Black's sentencing order. He simply could not refute them.

As the law requires in death penalty cases, an appeal was automatically taken to the Florida Supreme Court. Our highest state court reviewed the entire case, finding no error in trial or sentencing.

Meanwhile, the United States Supreme Court, in a case known as the "Gardner decision," imposed a new requirement. The U. S. Supreme Court ruled that state courts must provide convicted murderers with the entire pre-sentence report, including confidential portions, before imposing a death sentence.

Under the new rule, the Florida Supreme Court reviewed every death penalty case then pending to determine if the "Gardner" principle had been violated. Many death cases were returned to trial courts for resentencing, including four to Jacksonville courts.

The Florida Supreme Court, however, found that Judge Black had met the "Gardner" requirement in Raulerson's case, and found no further review needed.

Raulerson's attorneys next presented the same issue to the United States Supreme Court. This court refused to consider the matter.

On March 19, 1980, the governor and the Florida Cabinet heard Raulerson's plea for clemency. The prosecution vigorously opposed clemency. The plea was denied.

Twenty-three private citizens on a grand jury, twelve private citizens on a trial jury, and a judge elected by the citizens presided over Raulerson's indictment, conviction and sentencing.

Seven elected justices of the Florida Supreme Court reviewed the case and upheld the conviction and sentence.

The Supreme Court of the United States refused to intervene.

A full clemency hearing was held and the plea denied by an elected governor and six other high elected state officials.

On April 19, 1980, Gov. Graham signed a death warrant ordering Raulerson executed.

At 4 p. m. on May 9, 1980, U. S. District Judge William Castagna ruled Gov. Graham's death warrant was ineffective and void.

This single, federal judge effectively overruled the seven-member Florida Supreme Court, finding the record did not show Raulerson received the confidential portion of the pre-sentence report.

The issue of guilt wasn't even raised before Castagna yet he ordered Raulerson released if the state court did not reconsider the death sentence within 60 days.

I learned of Castagna's ruling just before leaving my office on May 9. Shortly, after I got home from work, Mike Stewart's dad called and asked me to explain why Judge Castagna had taken this action.

I had personally presented this case to the grand jury and tried the case. I had assisted the Florida Attorney General on the appeal and personally argued against clemency before the Cabinet and Gov. Graham.

Still, I was totally unable to give Mr. Stewart any rational, reasonable or coherent answer. After much reflection, I still cannot provide an answer, but I have reached some conclusions.

Let me add that it took this action, which I consider a total affront to the criminal justice system of Florida to cause me to change my 20-year-old policy of never publicly criticizing specific judicial decisions.

I do not know Judge Castagna and I do not criticize him personally.

I do fault a system that gives a lower federal court judge power to overrule the Supreme Court of Florida and the governor of this state as it was done in this case.

Seldom in mankind's history has uncontrolled power granted one man or one group of men not corrupted the holder of that power.

In 1887, Lord Acton, an English nobleman, said: *"Power tends to corrupt; absolute power corrupts absolutely."*

By default, absolute power has been placed in the hands of the federal judiciary and this country is now paying the price.

During our 200-year history, the Supreme Court of the United States and other federal courts have repeatedly checked the exercise of power by the legislative and executive branches of government. Presidents Roosevelt, Truman, Nixon and Carter, along with many before them, have felt the sting of federal court rulings.

Legislative acts of the U. S. Congress have been declared unconstitutional by federal courts on numerous occasions. Congress regularly checks the executive power of the president and the president frequently opposes and checks the exercise of power by Congress.

But, to my knowledge, the legislative branch of government has never checked the power of the federal judiciary.

Legislative power to check the courts does exist. The U. S. Constitution provides that "the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain or establish."

The Congress can lawfully and properly limit the jurisdiction of lower federal courts.

The very essence of our governmental structure is our system of checks and balances. Failure of one branch of government (legislative) to check the power of another branch (judicial), as was contemplated by our founding fathers, has resulted in dangerous overreaching and an outright abuse of power by the federal courts.

Justice Lewis Powell, supposedly a conservative on the U. S. Supreme Court, stated recently that the court's independence gives the court a freedom to make decisions that the legislative branch of our government may be reluctant to make.

With this prevailing view by the U. S. Supreme Court and knowing such judicial philosophy and practices go unchallenged at the highest levels of government, it is not difficult to understand why lower federal court judges overstep their bounds.

The inability of our federal courts to cope with judgment issues like the death penalty and their demonstrated inability to establish a system based on a sensible search for the truth and dealing with the truth with finality is leading this country into serious trouble.

Florida Atty. Gen. Jim Smith has asked Congress to enact legislation to curb powers of federal courts in proceedings similar to the Raulerson case.

I strongly urge responsible officeholders in federal government to consider our attorney general's recommendation and take steps to limit the awesome and unchecked power of the lower federal courts.

Their power is now absolute and the consequences are inevitable.

The issues involved are much greater than the electrocution of James Raulerson, though he should be electrocuted forthwith. The great issue involved is the integrity of the criminal justice system of our state and the federalist system itself.