[No. 34339.   *En Banc.*   February 13, 1959.]

JAMES O. SNEDDON *et al., Appellants,* v. FRANK EDWARDS, JR. *et al., Respondents.*[1]

OTT, MALLERY, and DONWORTH, JJ., dissent.

*Wright & Wright,* for appellants.

*Cook, Flanagan & Colvin,* for respondents.

PER CURIAM.—In 1941, Frank Edwards, Jr., and his wife, Ruth M. Edwards, purchased property on 39th Avenue, N.E., in the Lake City District north of Seattle. The property extended easterly toward Lake Washington for a distance of 360 feet. Approximately 240 feet from the street the land fell away sharply, and the remaining 120 feet extended down a steep slope.

In 1946, the Edwards had large quantities of sandy loam dumped and distributed on the level part of their lot for the purpose of raising and extending that portion of their property. Some of the fill dirt was bulldozed over the bank; it feathered out and downward to within 50 feet of their easterly property line. They made some attempt to terrace the slope through the use of scrap lumber, and they watered

[1]Reported in 335 P. (2d) 587.

and packed the fill. In time, the fill area was covered by vegetation.

In 1952, the Sneddons (plaintiffs) bought the tract of land directly to the east and down slope from the Edwards' land. The Sneddons' tract was wild and overgrown, except that the previous owner had bulldozed a cut or notch into the slope for a building site. The cut began about sixty feet east of the parties' common boundary line. At one point the cut was approximately fifteen feet deep.

In 1955, the Sneddons constructed a residence on their lot. During the months of October, November and December, 1955, heavy rains fell in the Seattle area. In the first four days of January, 1956, an additional 2.85 inches of rain fell in Seattle.

On January 5, 1956, shortly after six o'clock a.m., without any warning, a landslide suddenly demolished the Sneddons' house. In addition to the destruction of their home, much of their personal property was damaged, and they suffered personal injuries.

The Sneddons brought this action against the Edwards for damages, alleging that the landslide resulted when a large portion of the aforementioned Edwards' fill broke loose and crashed down the slope. The Edwards defended on the theory that the slide had started at, and was caused by, the cut or notch made in the slope by the prior owner of the Sneddon property; and futhermore, that the slide was caused by an "Act of God"; *i.e.*, unusual rainfall. After trial to the court, judgment was entered dismissing the Sneddons' action. They have appealed.

Turning now directly to the decisive action of the trial court in the case at bar, it is to be noted that, in his oral opinion, the trial judge said:

"Now we come to the major issue. All there is to this case, *notwithstanding all of the testimony of the experts and everybody else,* is this: It begins by the fact that the plaintiff built his home at the mouth of a natural water course. Everything on the side of that hill has been manu-

factured by water, and in it is a water course, and it is all due to erosion.

" . . .

"Now, we have *no testimony* that it fits exactly the upper end of that water course. Apparently, there is a street there. That water course, *if it amounted to anything*, extended beyond that street once." (Italics ours.)

The findings of fact and conclusions of law made by the trial judge follow directly from his theory of the case as set out in the above quotations.

■ A review of the record reveals that the gully or depression, running generally east and west along the northerly boundary of the parties' property, opens onto the appellants' property. It starts on the level area. Approximately 200 feet long, it is about 6 or 7 feet deep, and from 18 to 20 feet wide. The highest estimate, testimonially, of the volume of water coming down this gully during the three months prior to the slide was 50 gallons per hour. It is clear from the exhibits and the testimony that appellants' home was not demolished by water, but by a large volume of dirt or mud, either from the Edwards' fill or from other portions of the slope, or from both. It is also clear from our analysis of *Thorpe v. Spokane* (1914), 78 Wash. 488, 139 Pac. 221, that the depression or gully involved in this case was not a natural watercourse.

In passing, we are constrained to observe that the disregard of all of the evidence by the trial judge, and the application of his own theory to the case, "is sufficient to create a doubt in the minds of the . . . [appellants], and would, in the event of affirmance, make them wonder for all time whether they had had a fair trial." *Elston v. McGlauflin* (1914), 79 Wash. 355, 140 Pac. 396. Furthermore, we are convinced that the trial judge's findings of fact, conclusions of law, and his particular theory as to nonliability in this case are not supported by the record. The evidence as to the cause of the slide was sharply conflicting. The findings of the trial court do not resolve the problem and do not enable us to resolve the factual dispute.

Appellants contend that it was error for the trial court to exclude the testimony of one William Enkeboll, an engineer. Mr. Enkeboll was employed by respondents to make an investigation of the slide. According to appellants' offer of proof, Mr. Enkeboll's opinion as to the origin of the slide did not correspond to respondents' theory, so they chose not to call him as a witness. When appellants attempted to have him testify, respondents objected; and the trial judge sustained their objections—apparently on the ground that, since respondents had paid him for making his investigation, they were privileged to keep him from testifying.

The reason given was not adequate for excluding Mr. Enkeboll's testimony. See *Osborn v. Seattle* (1927), 142 Wash. 25, 252 Pac. 164; and *State ex rel. Berge v. Superior Court* (1929), 154 Wash. 144, 281 Pac. 335, in which we held that a doctor could be required to testify as to the facts which he had discovered upon his examination, and to answer questions as to his opinion regarding the nature and extent of injury, even though the doctor in each instance had been hired by the adverse party to make the examination. See, also, *Sachs v. Aluminum Co. of America* (1948), C.A. 6th Cir., 167 F. (2d) 570, in which the court held that an X-ray expert hired by one party had no privilege to refuse to answer the adverse party's questions. The court said:

"The primary concern of courts of justice is to elicit truth essential to correct adjudication."

For the reasons indicated hereinbefore, the instant case should be reversed and remanded for a new trial. It is so ordered.

OTT, J. (dissenting)—The majority reverse the trial judge on conflicting evidence because:

". . . The evidence as to the cause of the slide was sharply conflicting. The findings of the trial court do not resolve the problem and do not enable us to resolve the factual dispute."

The court's finding No. 6 is as follows:

"That plaintiffs [appellants] and cross-complainants

Erickson failed to allege or prove that the conduct of defendants [respondents] Edwards on their property was wrongful and failed in meeting the burden of proof that plaintiffs' and cross-complainants Ericksons' damages and injuries were caused by placing of fill on defendants Edwards' premises in 1946; that, in fact, the damages and injuries of plaintiffs and cross-complainants Erickson were caused by a heavy flow of water down said water course combined with some dirt picked up as the upper end of the water course retreated up the hill; nor were plaintiffs' injuries caused by any defect because of any cut made in the toe of the slope."

The record amply supports the finding of the court that the appellants built their home in the mouth of a natural water course or ravine, and that the respondents changed the elevation of their property in the year 1946. In 1956, an unprecedented rainfall caused only a small part of the Edwards' elevation to wash away. Four other slides, emanating from property of others not parties to this proceeding, occurred in the same area. There was no evidence that any of respondents' soil ever reached the appellants' property. Even the majority admit that there was a failure of proof as to respondents Edwards' liability when they say: ". . . appellants' home was not demolished by water, but by a large volume of dirt or mud, *either from the Edwards' fill or from other portions of the slope . . .*" (Italics mine.) The majority opinion is in accord with the findings of the trial court that appellant had not sustained the burden of proof.

The evidence most certainly does not preponderate against the court's findings.

The offer of proof of William Enkeboll's testimony was improperly excluded, for the reasons stated in the majority opinion. Mere exclusion of offered evidence is not a ground for reversal; the appellants must show that they were prejudiced by its exclusion. The decision of the trial court was not based upon the evidence as to where the slide started, but rather on the fact that the damage was caused "by a heavy flow of water . . . combined with some dirt."

Therefore, in the absence of a further showing that the "dirt" that caused the damage was that of respondents, the offered testimony of Enkeboll relating to the origin of the slide would not have affected the result, and its exclusion was not prejudicial to the appellants. *Sather v. Blodgett,* 169 Wash. 25, 13 P. (2d) 60 (1932).

The judgment should be affirmed.

MALLERY and DONWORTH, JJ., concur, with OTT, J.

June 4, 1959. Petition for rehearing denied.