Ronald HUTCHINSON, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 85SC510.

Supreme Court of Colorado,
En Banc.

Sept. 8, 1987.
Rehearing Denied Oct. 5, 1987.

David F. Vela, Colorado State Public Defender, Richard A. Hostetler, Sp. Deputy Public Defender, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., David R. Little, Asst. Atty. Gen., Denver, for respondent.

ROVIRA, Justice.

We granted certiorari to review an unpublished opinion of the court of appeals that affirmed the Denver District Court convictions of the defendant, Ronald Hutchinson, for second-degree forgery, § 18–5–103, 8B C.R.S. (1978 & 1983 Supp.), and conspiracy to commit second-degree forgery, § 18–2–201, 8B C.R.S. (1978). Certiorari was granted to consider whether the disclosure to and use by the prosecution at trial of the defendant's handwriting samples obtained by a defense-retained expert and the statements, opinions, and conclusions of the expert violated the confidentiality protected by the defendant's attor-

ney-client privilege, his constitutional right to effective assistance of counsel, his constitutional privilege against self-incrimination, and the confidentiality protected by the work-product doctrine. We now reverse defendant's convictions on the grounds that the trial court's decision to permit the prosecution to call the defense-retained expert in its case-in-chief absent waiver or compelling justification denied the defendant his constitutional right to effective assistance of counsel.

## I.

On January 13, 1983, a man entered a branch of the Union Bank in Denver and asked the receptionist for a blank check. When the receptionist asked if he had checks ordered, the man replied that his wife had done so. The receptionist directed the man to the second floor of the bank. He then stated that he had changed his mind and that he only needed deposit slips. The man took several blank slips and departed. The receptionist did not recognize the man as a regular customer and thought that he seemed uncomfortable and that his actions were suspicious. At trial, she identified the defendant as the person whom she had observed in the bank. The receptionist's supervisor informed the bank's head teller that a suspicious man had taken some blank deposit slips. The head teller immediately alerted the teller at the branch's drive-in window to be aware of any person using a blank deposit slip.

Shortly thereafter, the drive-in window teller observed a man who matched the general description given by the head teller drive up to one of the pneumatic tubes used to transact business at the drive-in window. The teller observed a woman with short dark hair in the passenger side of the car and no one in the back seat. The man put two checks made out to Pauline Pine and a deposit slip into the pneumatic tube carrier and sent the carrier to the teller. The deposit slip indicated that $200 was to be deposited and $287 was to be returned in cash. The teller compared the signature on the deposit slip with the one on file for the account. Although the sig-

nature on the deposit slip appeared authentic, the teller was suspicious because of the alert she had received from the head teller. She told the parties in the car that they would have to deposit both checks and wait to withdraw cash until the checks were paid by the drawee bank. The woman in the car requested the teller to return the checks. The teller complied, and the parties drove away. The teller identified the defendant as the man in the car who put the checks in the carrier.

A short time later a drive-in teller at a second Denver branch of the Union Bank observed a male and a Hispanic female drive up to the pneumatic tubes. A child under ten years of age was in the back seat of the car. The male presented checks for deposit that bore the same name as the checks that had been presented at the first branch. The parties making the deposit also wanted cash back on the deposit. The teller requested identification because the first branch had advised her that two individuals had tried to deposit allegedly stolen checks and withdraw cash. The teller heard the pair confer. The man then told the teller that the woman had left all identification at home. The teller confirmed that the signatures on the checks and deposit slip appeared to match the signature on file for the account; however, she informed the parties that without identification they only could deposit the entire amount and not receive any cash. The pair left the checks with the teller and departed. The teller noted the license plate number of the vehicle.

The second drive-in teller's supervisor identified the defendant as the man who participated in the transaction. The supervisor recalled, however, that the signatures presented during the transaction did not match the one on file. Further, she described the woman in the car as a light-skinned black woman. The supervisor also noted that she had met Pauline Pine's husband on one occasion and knew that the man was not her husband.

The checks presented for deposit on both occasions were issued to and endorsed in the name of Pauline Pine. The checks were presented for partial deposit to her bank account. Pine testified at trial that she neither endorsed the checks nor filled out the deposit slips, nor gave anyone permission to sign her name or use her account. She also stated that prior to January 13, 1983, a cancelled salary check previously issued to her had been stolen from her employer. Pine's signature, the name of her bank, and her bank account number were endorsed on the stolen check. The two checks the defendant presented for deposit were drawn on the accounts of Mark Bove and Edward Robinson. They had reported the checks as stolen. Bove and Robinson did not make out or sign and had not given anyone permission to complete or sign the checks.

The defendant's wife testified that her friend, Terry Smith, had requested the defendant and his wife to take Smith past her bank so that she could deposit some checks. Smith, according to the defendant's wife, was in the back seat of the car with the defendant's young son. The defendant, as the driver of the car, placed Smith's checks in the carrier and spoke with the teller. When the first branch of Smith's bank would not give her cash, the defendant drove Smith to another branch and again placed her checks in the carrier and spoke with the teller.

The defendant's fingerprint was on one of the checks, and the defendant conceded that he had passed the checks; he claimed, however, that he had passed the checks at the request of another person. The effect of his defense was a denial that he wrote the checks or knew that the checks were invalid. The People argued that the defendant had forged the writing on the checks and presented them for payment. Thus, a key issue in the case was the identity of the person who wrote the checks and the deposit slips.

Prior to trial, defense counsel sought authority to retain, at state expense, an expert in handwriting analysis in order to consult with the expert to prepare the cross-examination of prosecution witnesses and to conduct an independent analysis of the handwriting evidence. The trial court

granted the motion and a prosecution motion requesting authority to obtain fingerprints and handwriting exemplars from the defendant.

Subsequently, the People requested the district court to allow the prosecution to call the handwriting expert retained by the defense, Rolland Osborne, as a witness on behalf of the People. Defense counsel stated that the defense had decided not to call the expert and opposed the People's request. The court ruled that the attorney-client privilege protected any communication between the defendant and the defense-retained expert and denied the prosecution's request. The case proceeded to trial, and the court declared a mistrial on July 15, 1983, when the jury was unable to reach a verdict.

Before the second trial began on July 26, 1983, the trial court reversed its decision regarding the People's use of the defense-retained expert. The court ruled that under Crim.P. 16(II)(b), the court may require the defendant to disclose to the prosecution the reports or statements of the expert and the results of scientific tests, experiments, or comparisons even though the defendant did not intend to call the expert to testify at trial. The court further ruled that the privilege against self-incrimination, the attorney-client privilege, and the work-product doctrine did not protect the defense-retained expert from becoming the prosecution's witness. The court determined that the prosecution's examination of Osborne would exclude any communication between him and the defendant or defense counsel, including any advice or consultation; Osborne's testimony, however, could include his analysis of the handwriting exemplar.

Three handwriting experts testified at the second trial. The first expert, a Denver police officer, described how he had obtained a handwriting exemplar from the defendant. The expert believed that the defendant had disguised his handwriting because he had required excessive time to complete the sample, which was characterized by broken and shaky writing. Although the expert could not give any opinion as to whether the defendant had written the questioned checks, he stated that the handwriting from the defendant's exemplar was similar to the writing on the checks in several respects. The second handwriting expert, another police officer, also testified that he could not form an opinion based on the defendant's exemplar because it contained tremors, pauses, and hesitations. These characteristics indicated that the exemplar had been deliberately produced and did not represent the natural writing of its author, according to the second expert.

Osborne, the defense-retained expert, was the final handwriting expert to testify during the People's case-in-chief. Osborne described how he had obtained an exemplar from the defendant by having him complete some prepared forms and by dictating the information that appeared on the questioned checks for the defendant to fill in on simulated blank checks. According to Osborne, the defendant took an excessive amount of time to complete the exemplar, and Osborne had "an intuitive feeling" that the defendant was not writing up to his level of capability. Osborne stated that he did not believe the defendant had written the checks because the writing on them involved a higher level of writing skill than the defendant had demonstrated. Osborne concluded his testimony by discussing several similarities between the checks and the defendant's exemplar, including the defendant's misspelling of the words "settlement" and "Edward" as they had been misspelled in the questioned checks. On both the exemplar and the checks, the words had been spelled "settlment" and "Eward."

At the conclusion of his testimony, Osborne made a statement for the record outside the presence of the jury. He indicated that, as a document examiner, his relationship with his client depends to a considerable degree upon credibility, trust, and ethical behavior. Osborne stated his belief that when he is retained by one party to a legal proceeding he becomes an extension of the attorney-client relationship and his orally communicated opinions are protected from discovery by the attorney-client privilege. Osborne believed that if it generally became known that the prosecution

could utilize his opinions expressed to defense counsel he would never be employed by defense counsel. He emphasized that he was available to testify as a prosecution witness if first retained by the state.

Osborne also testified outside the presence of the jury that he had obtained the defendant's writing samples at the request of defense counsel by giving the defendant a letter of introduction from defense counsel to ensure that the defendant would not be reluctant to talk to him. When Osborne interviewed the defendant and obtained the writing samples, he told him that he represented defense counsel, that he was on his side, and made statements designed to assure the defendant that Osborne was present on behalf of the defense. Before he was subpoenaed by the prosecution, Osborne also consulted with defense counsel regarding the cross-examination of the prosecution's expert witnesses.

In closing argument, the assistant district attorney emphasized the "telling" effect of the consistent spelling errors and argued that this was "extremely crucial circumstantial evidence." The jury found the defendant guilty of second-degree forgery and conspiracy to commit second-degree forgery. The district court sentenced the defendant to concurrent terms of seven years in the penitentiary for forgery and three years for conspiracy.[1] The defendant appealed, and the court of appeals affirmed his convictions. The court of appeals relied on *People v. Perez*, 701 P.2d 104 (Colo.App. 1985), in which the court of appeals declined to extend the attorney-client privilege to exclude testimony in the case-in-chief by a handwriting expert originally retained by the defense. The court of appeals also held that handwriting exemplars are not entitled to protection under the fifth amendment privilege against self-incrimination. The court did not address the defendant's effective assistance of counsel or work-product doctrine claims, holding simply that the defendant's other contentions were without merit. We granted certiorari to review the defendant's claims.

## II.

This case raises troubling and difficult questions concerning issues on the frontier of the development of the law. We are asked to define, in the context of this case, the evidentiary and constitutional limits of proper prosecution use of evidence and witnesses derived from defense preparations for trial.

The issues in this case arise in connection with a growing trend in Colorado and elsewhere to permit pretrial prosecution discovery of aspects of the defendant's case. *E.g., Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); *People v. District Court*, 187 Colo. 333, 531 P.2d 626 (1975). Accompanying this trend has been a narrowing interpretation of a criminal defendant's privilege against self-incrimination, which was once thought to bar virtually all discovery in criminal cases. *See, generally* Allis, *Limitations on Prosecutorial Discovery of the Defense Case in Federal Courts: The Shield of Confidentiality*, 50 S.Cal.L.Rev. 461 (1977); Kessel, *Prosecutorial Discovery and the Privilege Against Self-Incrimination: Accommodation or Capitulation*, 4 Hastings Const. L.Q. 853 (1977).

As prosecutors have increasingly made use of their new-found discovery powers, an increasing number of cases have arisen involving attempts by the prosecution to use defense-retained experts and defense-obtained evidence against the defendant. The validity of these practices remains a subject of some dispute, and the cases discussing them seem to hinge largely on factual variations and judicial attempts to provide a fair and coherent balance between the powers of the prosecution and the rights of the defendant under the criminal justice practices of particular jurisdictions. *See United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1040 (E.D.N.Y.1976), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*,

---

1. The sentences were in the aggravated range because the defendant, at the time he committed the crimes in this case, was on bond awaiting trial of a felony charge for which he subsequently was convicted. *See* § 18-1-105(9)(a)(IV), 8B C.R.S. (1986).

431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977).[2]

We have addressed issues of this nature before. In *People v. Rosenthal*, 617 P.2d 551 (Colo.1980), we held that the privilege against self-incrimination prevented the prosecution from calling as a witness in its case-in-chief during the guilt phase of a criminal trial a privately retained defense psychiatrist in order to elicit from the psychiatrist incriminating admissions of the defendant. *Accord People v. Roark*, 643 P.2d 756 (Colo.1982). In *People v. District Court*, 187 Colo. 333, 531 P.2d 626 (1975), we upheld the constitutionality of Colorado rules permitting limited prosecutorial discovery of aspects of the defense case. However, we held that the rules could not be construed to permit discovery of expert reports and statements that the defendant did not intend to use at trial. We also held that a criminal defendant is protected by the work-product doctrine, although we did not specify the boundaries of that protection.

Earlier this year, in *Miller v. District Court*, 737 P.2d 834 (Colo.1987), we held that a psychiatrist retained by defense counsel to assist in the preparation of the defense is an agent of defense counsel for purposes of the attorney-client privilege, and thus, was covered by that privilege when called by the prosecution to testify at a pretrial hearing. We also held that the privilege was not waived by the defendant's assertion of a mental status defense alone.

Today we are asked to determine the propriety of the prosecution's use in its case-in-chief of a defense-retained handwriting expert and an exemplar provided for the expert's use. We hold that the prosecution's use of a defense expert in its case-in-chief in the absence of waiver or compelling justification violates a criminal defendant's constitutional right to effective assistance of counsel.

## A.

The sixth amendment to the United States Constitution and article II, section 16 of the Colorado Constitution guarantee a criminal defendant the right to counsel. That right is a fundamental component of our criminal justice system. *United States v. Cronic*, 466 U.S. 648, 653, 104 S.Ct. 2039, 2043, 80 L.Ed.2d 657 (1984). It is now universally accepted that lawyers representing defendants in criminal cases are "necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). Their presence is essential because they provide the means through which the other rights of the defendant are secured. Without counsel, the right to a trial itself would be "of little avail." *Cronic*, 466 U.S. at 653, 104 S.Ct. at 2043; *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects the defendant's ability to assert any other rights he may have. *Cronic*, 466 U.S. at 654, 104 S.Ct. at 2044. Indeed, the right to counsel is a significant component of a defendant's fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684–85, 104 S.Ct. 2052, 2062–63, 80 L.Ed.2d 674 (1984).

For that reason, it has been recognized that the right to counsel includes the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970); *People v. Norman*, 703 P.2d 1261, 1272 (Colo.1985); *People v. White*, 182 Colo. 417, 422, 514 P.2d 69, 71–72 (1973). The federal and state constitutions envision the role of counsel as critical to the ability of the adversarial system to produce just results. *Strickland*, 466 U.S. at 685, 104 S.Ct. at 2063. The premise of the right to effective assistance of counsel —indeed, the premise of our adversary system in general—is that partisan advocacy

---

**2.** It appears from the record that the People did not learn about Osborne's conclusions and the defense exemplar through discovery procedures but through a phone call by the prosecutor to the defense expert. However, the issues we address concerning the use of this information by the prosecution are related to issues of discovery and are important because they seem to be arising more often because of increasing prosecution use of discovery procedures.

on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. *Cronic*, 466 U.S. at 655, 104 S.Ct. at 2044. The right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. *Id.* 466 U.S. at 656, 104 S.Ct. at 2045. If the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. *Id.*, 466 U.S. at 656–57, 104 S.Ct. at 2045–46.

■ In carrying out his duty to provide effective legal assistance, counsel owes his client a paramount duty of loyalty. *Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980); *People v. Castro*, 657 P.2d 932, 943–46 (Colo.1983). Similarly, a defendant is entitled to representation by counsel that is reasonably competent. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065; *Norman*, 703 P.2d at 1272. To carry out this mandate, counsel has the duty to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. Additionally, as a part of his representation, counsel has a duty to make reasonable investigations in connection with the case or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. As a general matter, a proper investigation of the case is essential for adequate representation. *People v. White*, 182 Colo. 417, 421–22, 514 P.2d 69, 71 (1973). As we have said:

> Only through pre-trial preparation can the defendant be assured that facts will be discovered which will disclose potential defenses to a reasonably diligent and competent defense counsel. In the absence of adequate pre-trial investigation—both factual and legal—knowledgeable preparation for trial is impossible. Without knowledgeable trial preparation, defense counsel cannot reliably exercise legal judgment and, therefore, cannot

render reasonably effective assistance to his client.

*White*, 182 Colo. at 422, 514 P.2d at 71.

■ In an increasing number of cases, proper trial preparation requires a defense attorney to consult an expert. Criminal cases commonly involve complex issues revolving around medical, psychiatric, scientific or accounting concepts. Frequently, in these types of cases, it is not only desirable—but absolutely vital—that a defense attorney consult an expert for guidance and interpretation. Without such assistance, an attorney may be unable to rationally determine technical and evidentiary strategy or to properly prepare for cross-examination of the prosecution's witnesses or for presentation or rebuttal of physical evidence. *E.g., Miller v. District Court*, 737 P.2d at 838–39; *United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1047 (E.D.N.Y.1976), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). In some instances, an expert may be needed as a defense witness to establish a defense or to rebut a case built upon the powerful investigative arsenal of the state. Consequently, it cannot be denied that a defense counsel's access to expert assistance is a crucial element in assuring a defendant's right to effective legal assistance, and ultimately, a fair trial.

For that reason, we cannot sanction the prosecution's decision in this case to offer the defense's handwriting expert as a witness in its case-in-chief. Absent compelling justification or waiver, we believe that such a practice violates a defendant's right to effective assistance of counsel.

■ Heretofore, as both a legal and practical matter, the defense expert's relationship with the defendant and counsel has been protected from intrusions by the state. The law has recognized several doctrines that afford a degree of confidentiality to the expert-defense relationship. Thus, statements made to the expert by the defendant and counsel may be protected by the attorney-client privilege. *Miller v. District Court*, 737 P.2d at 838. Similarly, Crim.P. 16(II)(b), as we have construed it,

does not authorize prosecution discovery of an expert's reports or statements if that information will not be used at trial. *People v. District Court*, 187 Colo. 333, 341, 531 P.2d 626, 630 (1975). Additionally, although the scope of the doctrine is not clear in these circumstances, the work-product rule may also shield from disclosure materials produced by an expert. *People v. District Court*, 187 Colo. at 342–43, 531 P.2d at 631. In some circumstances, related privileges may apply to particular types of experts. *E.g.*, § 13–90–107(1)(d), (f), (g), 6 C.R.S. (1973 & 1986 Supp.) (privileges for physicians, surgeons, registered professional nurses, certified public accountants, licensed psychologists). And sometimes, a defendant's privilege against self-incrimination may prohibit prosecution use of statements of an expert where the expert is repeating, as a "conduit," statements made by the defendant. *People v. Roark*, 643 P.2d 756 (Colo.1982); *People v. Rosenthal*, 617 P.2d 551 (Colo.1980).

As a practical matter, too, an expert hired by defense counsel is likely to feel a degree of loyalty to the defendant's cause. We need not ascribe this fact to base motives on the part of the experts; indeed, the nature of the adversary process, the confidentiality surrounding legal representation and professional norms and ethics of particular experts all may foster this attitude of loyalty to the defendant.

We believe the confidentiality and loyalty of expert consultants traditionally enjoyed by defendants and defense counsel is a crucial element in the effective legal representation of the defendant. A relationship of trust permits the defendant, counsel and the expert to engage in a full and frank interchange, affording counsel an accurate and honest assessment of the defendant's case. Without such a relationship, the assistance of the expert, and thus defense counsel, is likely to be ineffective.

Consequently, the prosecution should not be permitted to intrude upon this relationship as a matter of course and convert a defense expert into a potential witness-in-chief against the defendant. We can imagine few intrusions more disruptive to the efforts of defense counsel.

If we were to accept the reasoning of the People in this case, defense attorneys might be deterred from hiring experts lest they inadvertently create or substantially contribute to the prosecution's case against their clients. Or, if an expert were hired, an attorney might have to insist on limited communications to assure his client protection if the expert were called as a state witness. As a protection, defense counsel might also tend to hire those experts whose opinions are more predictable—rather than independent experts—whose advice might be more helpful, but more risky to obtain. The result, we believe, would be marginal gains for the truth-seeking function of the judicial process, but severe damage to the ability of defense attorneys to provide effective assistance of counsel.

Therefore, we cannot approve the use of defense counsel's expert in the fashion employed in this case. Such a practice is inconsistent with the meaningful adversarial exchange guaranteed by the sixth amendment and article II, section 16 of the Colorado Constitution. As the Supreme Court has said, when the judicial process loses its character as confrontation between adversaries, the right to counsel has been violated. *Cronic*, 466 U.S. at 656–57, 104 S.Ct. at 2045–46.

We draw support for our conclusion from the fundamental tenet underlying our adversarial system and inherent in a defendant's guarantees of counsel, due process and the privilege against self-incrimination that the defendant has a right to require the prosecution to investigate its own case, find its own evidence and prove its own facts. *See United States v. Wright*, 489 F.2d 1181, 1195 (D.C.Cir.1973); *Miller v. District Court*, 737 P.2d at 838–39; *see also Noggle v. Marshall*, 706 F.2d 1408, 1421 (6th Cir.), *cert. denied*, 464 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983) (Edwards, C.J., dissenting).

Our decision is in accord with *State v. Mingo*, 77 N.J. 576, 392 A.2d 590 (1978), where the Supreme Court of New Jersey reached a similar result. In *Mingo*, a de-

fense handwriting expert concluded that the defendant had written certain notes that incriminated him in a rape and attempted robbery. Accordingly, defense counsel chose not to call the expert as a witness; the state, however, subpoenaed the expert and used his testimony in its case-in-chief. The court held that this practice violated the defendant's right to counsel under the sixth amendment and the New Jersey Constitution:

> To safeguard the defense attorney's ability to provide the effective assistance guaranteed by these constitutional provisions, it is essential that he be permitted full investigative latitude in developing a meritorious defense on his client's behalf. This latitude will be circumscribed if defense counsel must risk a potentially crippling revelation to the State of information discovered in the course of investigation which he chooses not to use at trial.

*Mingo*, 392 A.2d at 592. The court also stated that:

> A defense attorney should be completely free and unfettered in making a decision as fundamental as that concerning the retention of an expert to assist him. Reliance upon the confidentiality of an expert's advice itself is a crucial aspect of a defense attorney's ability to consult with and advise his client. If the confidentiality of that advice cannot be anticipated, the attorney might well forego seeking such assistance, to the consequent detriment of his client's cause. The protection from unwarranted disclosure we today mandate is an indispensable element of a criminal defendant's constitutional right to the effective assistance of counsel.

*Mingo*, 392 A.2d at 595. The court also found that the state had no justification for using the defendant's handwriting expert as it was fully capable of hiring its own

expert; in the "vast majority" of situations, the court noted, the state's ability to obtain potentially necessary expert testimony would be unhampered by its ruling. *Mingo*, 392 A.2d at 592, 595. In the rare case involving few available experts, the court held, the trial court could take appropriate action to prevent a defendant from "scooping-up" the available experts in the field. *Mingo*, 392 A.2d at 595 n. 3.[3]

Similarly, in *United States v. Alvarez*, 519 F.2d 1036 (3d Cir.1975), the Third Circuit found a violation of a defendant's "sixth amendment attorney-client privilege" where a defense expert, a psychiatrist in that case, was used by the prosecution as a witness in a proceeding to determine the defendant's sanity. The court stated:

> The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

*Alvarez*, 519 F.2d at 1046–47.[4]

Indeed, in most cases involving prosecution attempts to use defense-retained psy-

---

**3.** The court in *Mingo* went on to hold that the constitutional violation had been harmless error because the defendant had conceded in that case that he wrote the note in question but argued instead that the note was not the one used in the crime. Thus, the expert's testimony had been merely cumulative.

**4.** In *Alvarez*, the defendant presented evidence of his insanity including psychiatric testimony prior to the prosecution's presentation of its case. However, under Third Circuit precedent, the United States bears the burden of proving a defendant's sanity. Nevertheless, in *Alvarez*, the parties agreed for reasons unexplained that the

chiatric experts, courts have afforded protection for the defense expert although in many cases courts have relied on the attorney-client privilege as the basis for their holding. *See Miller v. District Court*, 737 P.2d 834 (Colo.1987); *Houston v. State*, 602 P.2d 784 (Alaska 1979) (prosecution use of defense-retained psychologist as rebuttal witness implicated attorney-client privilege but waiver found; court did not reach sixth amendment issue); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975) (prosecution use of defense psychiatrists as witnesses violated attorney-client privilege, but error was harmless); *State v. Toste*, 178 Conn. 626, 424 A.2d 293 (1979) (prosecution use of defense psychologist as witness violated attorney-client privilege and sixth amendment); *Pouncy v. State*, 353 So.2d 640 (Fla.App.1977) (prosecution use of defense psychiatrists as witnesses violated attorney-client privilege); *State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979) (prosecution use of defense psychiatrist as rebuttal witness violated attorney-client privilege; possible impact on sixth amendment rights noted); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971) (prosecution's use of defense psychiatrist as a witness violated attorney-client privi-lege); *State v. Moore*, 45 Or.App. 837, 609 P.2d 866 (1980) (prosecution's use of defense psychiatrist as rebuttal witness violated attorney-client privilege but error was harmless); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957) (prosecution's use of defense psychiatrist as rebuttal witness violated attorney-client privilege).[5]

Some courts, however, have refused to find a sixth amendment violation in cases involving prosecution use of the testimony of defense experts; nevertheless, we do not believe those cases control our decision here. *See Noggle v. Marshall*, 706 F.2d 1408 (6th Cir.), *cert. denied*, 464 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983); *Edney*, 425 F.Supp. at 1038; *see also United States v. Talley*, 790 F.2d 1468 (9th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 224–25, 93 L.Ed.2d 152 (1986); *Granviel v. Estelle*, 655 F.2d 673 (5th Cir.1981), *cert. denied*, 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870, 875 (1982); *State v. Craney*, 347 N.W.2d 668 (Iowa), *cert. denied*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984); *State v. Dodis*, 314 N.W.2d 233 (Minn.1982); *State v. Carter*, 641 S.W.2d 54 (Mo.1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983).

defendant would present his evidence first. Consequently, the defense expert's testimony in *Alvarez* was used by the prosecution in what was in essence its case-in-chief, although the evidence followed the defendant's presentation.

5. We also note by analogy the Supreme Court's decision in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), which involved a prosecution intrusion into defense counsel's trial preparations. *Weatherford* involved a convicted defendant's suit under 42 U.S.C. § 1983, alleging a violation of the defendant's right to effective assistance of counsel. Weatherford, an undercover agent, and the defendant and two others had vandalized certain offices. After Weatherford and the defendant were arrested, Weatherford's identity was not disclosed to protect his undercover status. Subsequently, at the defendant's request, the defendant and his counsel met and conferred with Weatherford on two occasions concerning trial strategy. On the day of the trial, Weatherford's identity was disclosed and he testified as a prosecution eyewitness. The Supreme Court found no violation of the defendant's right to counsel, however, primarily because Weatherford had not disclosed any defense strategy matters to the prosecution and his testimony at trial on behalf of the prosecution had not touched on these matters. Because no prejudice was shown, the Court was "quite unconvinced" that a sixth amendment claim had been made out. In summarizing its prior cases on point, the court stated:

> If anything is to be inferred from these ... cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial.

*Weatherford*, 429 U.S. at 552, 97 S.Ct. at 842. At another point, the Court indicated its disagreement with Weatherford's argument that:

> [W]henever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial.

*Weatherford*, 429 U.S. at 554, 97 S.Ct. at 843.

*Noggle,* for instance, involved a habeas corpus challenge to the defendant's murder conviction in an Ohio trial. Prior to the murder trial, the defendant had refused to cooperate with the court-appointed psychiatrist. At trial, the defendant sought to prove his insanity and introduced the testimony of two psychiatric experts in support of his contention. In rebuttal, the prosecution called a third psychiatrist witness that had been retained by the defense who testified that in his opinion the defendant was not mentally ill at the time of the crime. On appeal, the Ohio Court of Appeals concluded that as an incident to the constitutional guarantee of effective counsel, a limited privilege should be recognized for psychiatric experts consulted by the defendant; however, in this case, the court found the privilege waived by the defendant's decision to produce some, but not all, of his psychiatric experts as witnesses.

In the habeas corpus action, the Sixth Circuit noted that the prosecution's calling of the defense psychiatrist raised "a difficult question under the Sixth Amendment," but ultimately concluded that the balance drawn by the Ohio court was not so detrimental to the attorney's effective representation of his client as to be prohibited by the sixth amendment. The court's reasoning was primarily based on its desire to permit states to experiment and innovate in this developing area of the law.

Similarly, in *Edney,* probably the most influential case in this area, Judge Weinstein examined at great length the constitutional and evidentiary issues raised by a defendant's habeas corpus challenge to a New York conviction. During the petitioner's trial, the prosecution was permitted to use a defense psychiatrist as a witness in rebuttal to another psychiatric witness presented by the defense. Judge Weinstein acknowledged that the New York rule presented the prospect of substantial prejudice to criminal defendants, but ultimately held that the constitution, including the sixth amendment right to counsel, did not mandate a more extensive privilege.

One significant factor in Judge Weinstein's decision was the posture of that case. The prosecution's use of the defense witness occurred only on rebuttal, after the defendant had produced a contrary psychiatric expert as a witness. Judge Weinstein also emphasized that the defense expert was used not to establish the defendant's guilt, but only on the limited issue of the defendant's sanity. Additionally, the judge desired to avoid a constitutional holding that would deny courts and legislatures reasonable freedom to develop new approaches to issues of this nature.[6]

Unlike these cases, we deal today with a case involving prosecution use of an expert witness in its case-in-chief, not on rebuttal. The issue involved is the defendant's guilt, not the limited issue of sanity. Moreover, the prudential concerns expressed in *Noggle* and *Edney* are less applicable to our decision today. It is the function of this court to determine the proper scope of constitutional guarantees for criminal defendants in this state. Accordingly, we do not regard these cases as controlling.

However, we emphasize that our holding today is of a limited nature. Our decision does not involve rebuttal use of expert witnesses or prosecution use of nonexpert

**6.** The facts also distinguish other cases in which courts have refused to find a sixth amendment violation because of prosecution use of the testimony of defense experts. *E.g., United States v. Talley,* 790 F.2d 1468 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 224–25, 93 L.Ed.2d 152 (1986) (prosecution used defense psychiatrist only on rebuttal after defense had offered testimony of a psychologist); *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870, 875 (1982) (defendant refused to cooperate with state psychiatrists while aiding his own experts; defense expert's testimony pertinent only to insanity issue, not guilt issue); *State v. Craney,* 347 N.W.2d 668 (Iowa), *cert. denied,* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984) (use of defense expert in state's case-in-chief violated fifth amendment in some respects but not sixth amendment; only contested issue in case was defendant's sanity); *State v. Carter,* 641 S.W.2d 54 (Mo.1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983) (prosecution called defense psychiatrist on rebuttal after defense had introduced testimony of another psychiatrist); *State v. Dodis,* 314 N.W.2d 233 (Minn.1982) (defense expert used as witness only in mental illness stage of bifurcated proceedings).

witnesses. Further, we recognize and accept the view of the Supreme Court that inquiries into claims of ineffective assistance of counsel should ordinarily focus on the facts of individual cases. *See United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984); *Strickland v. Washington*, 466 U.S. 668, 684–98, 104 S.Ct. 2052, 2062–70, 80 L.Ed.2d 674 (1984). Although some claims of ineffective assistance may be dealt with on a per se basis, we believe that the violation involved in this case requires a showing of prejudice to warrant relief. *Cronic*, 466 U.S. at 657–662, 104 S.Ct. at 2046–48; *Strickland*, 466 U.S. at 691–96, 104 S.Ct. at 2066–69; *cf. Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (suggesting that a limited showing of prejudice should be necessary).[7] The standard as set forth in *Strickland* is whether there is a reasonable probability that, absent the improperly used witness, the factfinder would have had a reasonable doubt respecting guilt. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068. We turn, therefore, to the facts of this case as they apply to the standards we have enunciated.

### B.

■ First, we conclude that the defendant did not waive the confidentiality of his expert's conclusions for purposes of the use of Osborne's testimony in the prosecution's case-in-chief. The defendant's plea of not guilty cannot be construed as a waiver without completely emasculating the protection we deem to be necessary for effective assistance of counsel. In *Miller v. District Court*, 737 P.2d at 839, we held that a defendant's assertion of a mental status defense alone did not waive his right to assert the attorney-client privilege as applied to the testimony of a defense-retained psychiatrist. We believe a similar principle applies here.

■ Nor can we find a waiver here because the defendant presented the testimony of his wife which tended to suggest that Terry Smith, and not the defendant, may have been responsible for the forging of the checks. Since the defendant offered his wife's testimony after the prosecution's case-in-chief, we see no basis to construe this testimony as an implied waiver.

■ Similarly, we can find no compelling justification in this record for the prosecution's use of Osborne's testimony in its case-in-chief. There is no suggestion that the prosecution could not obtain other competent experts in the field of handwriting analysis. Indeed, the prosecution's use of two police staff experts as expert witnesses for this purpose seems to refute that proposition.

Nor do we believe it was justified for the prosecution to use Osborne in its case-in-chief because the defendant may have attempted to disguise his handwriting and thus thwart the efforts of the prosecution's experts. Initially, we note that it is not clear from the record whether the defendant did in fact attempt to disguise his handwriting. Even if it be assumed that he did, it must also be assumed that this attempt extended to his own expert because Os-

---

7. In *Cronic*, the Supreme Court described in narrow terms the instances in which a presumption of prejudice may be indulged in ineffective assistance cases. *Cronic*, 466 U.S. at 657–62, 104 S.Ct. at 2046–48. Such a presumption is warranted, it held, in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046. As an example, it cited a complete denial of counsel at a critical stage of a defendant's trial. It also acknowledged that a presumption may be appropriate in some cases in which "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 660, 104 S.Ct. at 2047. The fact that a limitation on counsel's performance is due to an "external constraint" rather than counsel's own incompetence was not viewed as determinative. *Cronic*, 466 U.S. at 662 n. 31, 104 S.Ct. at 2048 n. 31. The Court noted that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." Therefore, it concluded, that "[a]bsent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046.

borne also testified to the defendant's laborious and deliberate handwriting style. This does not appear, therefore, to be a case where the defendant refused to cooperate with the prosecution's experts while actively aiding his own expert. *Compare, Noggle,* 706 F.2d at 1408; *Granviel,* 655 F.2d at 673.

Moreover, the real value of Osborne's testimony was to demonstrate the consistency of spelling errors made by the defendant with those made by the forger of the checks. However, it appears that Osborne designed his analysis to specifically check for such spelling idiosyncracies whereas the police experts did not. Consequently, we see no justification in permitting the prosecution to use a defense expert simply because its own experts failed to conduct their own tests in a manner that could have produced results equivalent to those of the defense expert.

Furthermore, we believe the prosecution's use of Osborne's testimony is especially unjustified because of the assurances Osborne made to the defendant in order to obtain the defendant's cooperation. Similarly, defense counsel's use of Osborne for consultation on trial strategy weighs against any argument that the prosecution's actions were justified.

Finally, we conclude that without the testimony of Osborne, there is a reasonable probability that the jury would have had a reasonable doubt concerning the defendant's guilt. We note that it was not crucial for the prosecution to show that the defendant forged the checks in question. A showing that the defendant had "uttered" the checks with intent to defraud would have been enough. However, evidence that the defendant had personally forged the check would also have been crucial as to his intent to defraud and would rebut defendant's claims that he merely passed the checks without knowledge that they were forged.

The prosecution clearly recognized the significant impact the defendant's spelling errors would have in proving its case. In defendant's first trial, without this evidence, a mistrial had resulted. Thereafter, the prosecution ran the risk of seeking to use this evidence despite the uncertain state of the law in this area. Subsequently, at trial, the prosecution emphasized to the jury the "telling" impact of this evidence and argued that it was "extremely crucial circumstantial evidence." We do not think the prosecution should now be heard to say the admission of Osborne's testimony was harmless. Accordingly, we conclude that there is a reasonable probability that the defendant's conviction would not have resulted but for the prosecution's unjustified use of Osborne's testimony in its case-in-chief.

Consequently, we reverse and remand for a new trial.[8]

VOLLACK, J., dissents.

ERICKSON, J., joins in the dissent.

VOLLACK, Justice, dissenting:

I respectfully dissent because I disagree with the result reached by the majority, and with the majority's sixth amendment/effective assistance of counsel analysis in arriving at that result. In my view, the case can be resolved by analysis under the Colorado Rules of Criminal Procedure and the attorney-client privilege. § 13–90–107, 6 C.R.S. (1986 Supp.). Relying on the well-settled principle that this court will not rule on a constitutional question which is not essential to resolution of the controversy before it, I believe the court should resolve the case without resort to the sixth amendment. *Ricci v. Davis,* 627 P.2d 1111, 1121 (Colo.1981). I agree with the language originally adopted in *Edney v. Smith:* "[I]t seems undesirable at this time to canonize the majority rule on the attorney-psychiatrist-client privilege and freeze it into a constitutional form not amenable

---

8. Because we conclude the defendant's right to effective assistance of counsel was violated by the prosecution's use of Osborne's testimony, we do not decide how the attorney-client privilege, work-product doctrine and privilege against self-incrimination apply to the use of such testimony. Nor do we decide whether the prosecution's use of the handwriting exemplar—apart from the use of the defense expert—was proper.

to change by rule, statute, or further case-law development." 425 F.Supp. 1038, 1054 (E.D.N.Y.1976), *aff'd without opinion*, 556 F.2d 556 (2d Cir.1977).

## I.

This case involves the prosecution's use of a report prepared by the defense-retained handwriting expert, as well as the prosecution's use of this expert as a witness in its case-in-chief. I believe the report is discoverable under Crim.P. 16, and that the attorney-client privilege, rather than the sixth amendment, controls use of the expert's testimony in the prosecution's case-in-chief.

The defense-retained expert obtained the defendant's handwriting exemplar and generated a report which set forth his conclusions, based on a comparison of the exemplar and the handwriting on the forged checks at issue in the case. Crim.P. 16 II(b) provides for discovery in criminal cases, and states in pertinent part:

Subject to constitutional limitations, the trial court may require that the prosecuting attorney be informed of and permitted to inspect and copy or photograph any *reports or statements of experts*, made in connection with the particular case, *including results of ... scientific tests, experiments, or comparisons.*

Crim.P. 16 II(b), 7B C.R.S. (1986) (emphasis added). This discovery provision has been held constitutional on its face. *People v. District Court*, 187 Colo. 333, 531 P.2d 626 (1975) [hereinafter *District Court*].[1] Crim.P. 16 II(a)(1) provides for prosecutorial discovery of "any nontestimonial identification as provided in [Crim.P.] 41.1(h)(2)"; Crim.P. 41.1 defines handwriting exemplars as nontestimonial identification.

Under these two provisions of Crim.P. 16, I believe that the report generated by the handwriting expert, which contained results of his "scientific tests, experiments, or comparisons," is discoverable by the prosecution.[2] This is especially true since the report analyzes nontestimonial identification, and handwriting exemplars do not trigger fifth amendment self-incrimination provisions.[3] The unambiguous language of Crim.P. 16 calls for this result, and the defendant's fifth amendment rights are not at issue under these facts.

## II.

The second issue is whether the prosecution's use of the defense-retained expert witness' testimony in its case-in-chief violated the attorney-client privilege. The expert testified as to the procedure by which he obtained the handwriting exemplar, his observations as to the manner in which the defendant wrote the exemplar, his opinion that the defendant had not written the

---

**1.** We also held in *District Court* that "when the defendant is compelled to provide a handwriting exemplar, his Fifth Amendment right against self-incrimination is not contravened, because the exemplar is an identifying physical characteristic, rather than a communication within the privilege." 187 Colo. at 340, 531 P.2d at 630. Under Crim.P. 41.1, the handwriting exemplar is nontestimonial evidence, hence not governed by the self-incrimination limits of the fifth amendment.

**2.** I believe that the majority incorrectly interprets *People v. District Court*, 187 Colo. 333, 531 P.2d 626 (1975). The majority cites *District Court* for the proposition that Crim.P. 16 II(b) does not authorize the prosecution's discovery of expert reports if the reports will not be used at trial. Maj. op. at 881–882. My interpretation of *District Court* is that Crim.P. 16 II(b) does not permit discovery where such discovery would result in a violation of the fifth amendment protection against self-incrimination. Although

*District Court* included the phrase "or to disclose information which will not be used at trial," *id.* at 341, 531 P.2d at 630, the court also found it significant that language in an earlier draft of the rule, which "confined discovery to those reports and examinations which the defendant intended to introduce at the time of trial" was removed and replaced with the phrase "[s]ubject to constitutional limitations." *Id.* Finally, in its instructions on remand, the court directed the trial court to conduct "a hearing to gauge the impact on the defendant's Fifth Amendment right of the discovery which was requested." *Id.* at 343, 531 P.2d at 632.

Viewing *District Court* in this context, I believe the dictum addressing discovery of reports which will not be used at trial applies in the context of possible fifth amendment violations. The physical characteristic evidence at issue here is nontestimonial in nature and does not fall under the fifth amendment provisions.

**3.** *See supra* note 1.

forged checks, and a review of the similarities and dissimilarities between the forged checks and the defendant's exemplar. The trial court ruled that the expert could testify regarding his observations of the defendant's manner and his analysis of the exemplar, but could not testify as to any communications he may have had with defense counsel or the defendant.

The attorney-client privilege prohibits disclosure of confidential communications between the client and his attorney or agents of his attorney, when the communications are made in the course of gaining legal counsel or advice. *Miller v. District Court*, 737 P.2d 834, 837 (Colo.1987). Colorado's privilege statute is a codification of the common law attorney-client privilege, *id.* at 837 n. 2, and states in pertinent part:

An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

§ 13–90–107(1)(b), 6 C.R.S. (1986 Supp.). The attorney-client privilege exists for the benefit of the client and can be expressly or implicitly waived by the client's words or conduct. *A v. District Court*, 191 Colo. 10, 22, 550 P.2d 315, 323 (1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Section 13–90–107(1)(b) has been held to extend to communications between the client and agents of the attorney, based on the recognition that attorneys require the help of others to effectively handle clients' affairs. *Miller*, 737 P.2d at 837–38. However, in general the attorney-client privilege is strictly construed "in the interest of bringing to light relevant facts." *People v. Donovan*, 19 Cal.Rptr. 473, 478, 57 Cal.2d 346, 354, 369 P.2d 1, 5 (1972).[4]

A.

I believe that analysis of the expert's testimony requires that we recognize distinctions between testimony as to confidential communications that occurred between the client and a defense-retained expert, and testimony regarding "things which [the expert] observed or discovered himself without resort to the client's admissions." Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 464 (1962) [hereinafter *Discovery*]. Testimony about a client's confidential communications to his attorney's agent is qualifiedly protected under section 13–90–107; this prohibition serves the underlying purpose of encouraging open and candid discussion between client and attorney. *A v. District Court*, 191 Colo. at 22, 550 P.2d at 324. However, testimony about an expert's "observations and conclusions, apart from the client's communications to him, constitute[ ] knowledge on the part of the [expert] which would be highly material to the case." *Discovery* at 463; *cf. San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951).

This court has recognized that the attorney-client privilege is not absolute, and underlying social policies "may sometimes conflict with other prevailing public policies and, in such circumstances, the attorney-client privilege ... must give way." *Law Offices of Bernard D. Morley v. MacFarlane*, 647 P.2d 1215, 1220 (Colo.1982). An analogous example of conflicting social policies is the crime-fraud exception to attorney-client privilege, which provides that "communications between a client and his attorney are not privileged if they are made for the purpose of aiding the commission of a future crime or of a present continuing crime." *Id.*

The trial court permitted the expert to testify as to his observation that the de-

---

**4.** In *Donovan,* the California Supreme Court held that an appraiser's opinion as to the value of the property in dispute did not fall within the attorney-client privilege because the testimony sought "goes only to matter of the appraiser's subjective knowledge, as distinguished from his disclosures to plaintiff's counsel. This knowledge, in and of itself, is not privileged...." 19 Cal.Rptr. at 478, 57 Cal.2d at 355, 369 P.2d at 5.

fendant wrote the exemplar in a very slow, "very laborious," forced manner. The expert testified that he "felt that the Defendant was not writing so much as he was drawing pictures.... It simply was drawing letters, very carefully, very slowly, in a very laborious manner." This portion of the testimony involved an independent observation made by the expert, which was not related to the content or substance of any confidential communication.

"As a general rule, identifying physical characteristics such as one's style of handwriting, readily observable by anyone, are not subject to the attorney-client privilege." *United States v. Pipkins*, 528 F.2d 559, 563 n. 2 (5th Cir.), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). Nontestimonial evidence such as handwriting serves as an identifying physical characteristic in the same manner as blood and hair samples, scars, a limp, or a voice characteristic such as stuttering. Observations of physical characteristics constitute "an exhibition which converts the viewer into an eyewitness of material facts." *Discovery* at 465. For example, while a client can refuse to divulge the substance of statements protected by attorney-client privilege, he "cannot refuse to testify and reveal [a] scar itself merely because he showed it to the attorney." *Id. See United States v. Weger*, 709 F.2d 1151 (7th Cir.1983) (attorney-client privilege does not prevent disclosure of "characteristics of the type style" of a letter written by a client to her lawyer because, like a handwriting exemplar, they are "merely 'identifying physical characteristics.'" *Id.* at 1156); *Darrow v. Gunn*, 594 F.2d 767 (9th Cir.), *cert. denied*, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979) (applying California law, held that attorney-client privilege does not prevent attorney from testifying as to his observations of the client, including the client's appearance and demeanor); *State v. Regier*, 228 Kan. 746, 621 P.2d 431 (1980) (the disclosure of physical characteristics is not a confidential communication under the attorney-client privilege); *DeFusco v. Giorgio*, 440 A.2d 727 (R.I.1982) (attorney-client privilege not violated where attorney testified as to his former client's demeanor, and to his assessment of client's knowledge and state of mind). *See also* 8 Wigmore, *Evidence* § 2306, at 558–591 (McNaughton Rev. 1961 & 1987 Supp.).

This specific exception to the attorney-client privilege is not without limits, and where testimony regarding identifying physical characteristics in a particular case would result in unfairness,[5] or would cause a violation of the defendant's constitutional rights, a trial court could exercise its discretion in deciding to limit the disputed testimony.

### B.

There is a distinction between "objectively observable particularizations" of the client's demeanor, which are not privileged, and confidential communications between the attorney's agent and the client, which are privileged. *United States v. Kendrick*, 331 F.2d 110, 114 (4th Cir.1964). In some cases, the observations may even be "inextricably intertwined with communications." *Id.* at 115 (Sobeloff and Bell, JJ., specially concurring). The attorney-client privilege does not extend to knowledge obtained by independent observation, but the privilege does protect the substance of confidential communications from use by the prosecution in its case-in-chief. " '[I]t is fundamentally unfair to use defendant's incriminating admissions to a psychiatrist during a psychiatric examination as part of the prosecution's case to establish his guilt.' " *State v. Craney*, 347 N.W.2d 668, 672 (Iowa), *cert. denied*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984) (quoting *Collins v. Auger*, 428 F.Supp. 1079, 1082–83 (S.D. Iowa 1977)). On the other hand, " '[n]othing in the policy of the [attorney-client] privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining

---

**5.** A number of jurisdictions have adopted this "unfairness rule." For a list of the jurisdictions, see *Discovery* at 482 n. 14. *But see Sneddon v. Edwards*, 53 Wash.2d 820, 335 P.2d 587 (1959) (trial court erred in prohibiting defense-retained engineer from testifying for the plaintiffs, even though defense did not intend to call him as a witness).

them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam.'" *Pipkins*, 528 F.2d at 563, (quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)).

Applying these principles, I believe the attorney-client privilege extends to the expert's testimony as to confidential communications between the expert and the client or the client's attorney, related to the rendering of expert services. *Pipkins*, 528 F.2d at 564. However, the remainder of the expert's testimony in this case involved his comparisons of similarities and dissimilarities between the forged documents and the exemplars. The expert's opinion on direct examination was that the forged handwriting had not been written by the defendant.[6] He testified that there were "many" areas of dissimilarity between the exemplar and the forged documents, concluding that "[i]n point of fact, most of them are dissimilar."

On this basis, I believe that the trial court appropriately limited the expert's testimony; the record reveals no testimony by the expert regarding any confidential communications. Under these limited circumstances, admission of the handwriting expert's testimony as to his observations and handwriting analysis did not violate the attorney-client privilege. Because the expert's testimony was limited in this manner, I would affirm the conviction. I respectfully dissent.

I am authorized to state that Justice ERICKSON joins in this dissent.

---

6. The expert testified before the jury: "From my comparison of his known writing with the writing on the checks, on the deposit slips, it was my opinion then and it is now that if that is a true representation of the level of writing skill of the Defendant, then, he could not have written the face side or the backside of the checks or the deposit slips."