OPINION
Ernest Fairchild appeals from his conviction of burglary in the Darke County Common Pleas Court., Appellant has set out many of the facts elicited at the trial of this matter and those facts are supported by the record.
On May 29, 1997 Officer Carl Teeter of the Versailles Police Department was dispatched to 142 E. Ward Street in Versailles, Ohio, the home of Michael and Kelly McGraw, on the report of a break-in. Upon arrival, and after an initial check of the scene, Officer Teeter called evidence technician, Officer Jamie McGlinch, to the residence. McGlinch proceeded to photograph the location and collect evidence, including but not limited to, fingerprint evidence. Officer Teeter interviewed the complainants and secured a statement from Kelly McGraw that she suspected that her nephew, Garry M. Richhart, might be responsible for the break-in. The house had been "trashed" and several items of property were stolen from the house including some guns and swords.
Versailles Police Officer Coatney and an investigator from the Darke County Prosecutor's office traveled to New Carlisle, Ohio on May 30, 1997 to interview Richhart. After receiving information that the defendant might also be involved, representatives from the Versailles Police Department interviewed the defendant and a third individual, Jamie Chassereau. At the conclusion of the interviews Richhart was arrested and transported to the Darke County Jail.
The defendant denied involvement in the burglary but indicated that Richhart and Chassereau came to his home in New Carlisle and tried to sell him some guns and swords.
On June 1, 1997 Officer Coatney was called to the Darke County Sheriff's Department where Richhart was incarcerated. Richhart gave a revised statement to Coatney implicating the defendant in the crime. The defendant was arrested on June 1, 1997 on the charge of burglary and was incarcerated in the Darke County Jail., Appellant was fingerprinted as part of the routine book-in procedure and his fingerprints were later matched to a single fingerprint taken from a book at the scene of the break-in. The book was not preserved as evidence for trial.
At trial, Kelly McGraw testified that her nephew, Garry Richhart, had lived with them for a brief time but moved out about a month before the burglary. She testified she immediately suspected Richhart because money was missing from her hiding place inside a parrot doll and Richhart knew of this secret hiding place. Ms. McGraw stated she did not know the defendant at all. (Tr. 43).
Jamie Chassereau, age eighteen, testified he drove Garry Richhart and the defendant over to Richhart's aunt's house on the day of the burglary from New Carlisle. He testified that Richhart went into the McGraw house first and then Richhart asked the defendant to join him. Chassereau said they returned to his car carrying a big leather coat, CD's, an assault rifle, and a couple of swords. Chassereau testified they told him to open the truck of his car and at that point he knew that Richhart and the defendant had stolen the items they were bringing to his car.
Chassereau said he then drove Richhart and the defendant back to the defendant's house in New Carlisle. Chassereau said the stolen items were taken into the defendant's house except the gun, the swords, and the CD's. Chassereau said he didn't get any of the property but the defendant paid him one hundred dollars. He admitted he was never charged with a crime but he denied he was promised anything for his testimony. On cross-examination, Chassereau admitted he initially denied any knowledge of the burglary but changed his story when police found the swords in his bedroom.
Anita Muse testified that she and the defendant, the father of her two children, resided together in New Carlisle at the time of the burglary. She specifically remembered the defendant leaving the morning of the burglary with Jamie Chassereau and Garry Richhart and subsequently returning and dividing up the stolen property. She said the items included a long leather duster trench coat, and a painted wolf T-shirt which she had voluntarily recently turned over to the prosecutor's office. The coat matched the description of one stolen during the burglary while the T-shirt was specifically identified by Kelly McGraw as belonging to her.
Ronald L. Huston, a latent print examiner with the Miami Valley Crime Laboratory, testified he compared the latent fingerprint recovered from the crime scene with that of the defendant's known fingerprints. The latent print was placed on latent print cards and preserved for comparison by Huston. Huston testified that one latent print impression was identified as the left ring finger of the defendant by comparing the latent print to the known exemplar of the defendant.
Ralph Nickoson, a fingerprint examiner in private practice, testified as a State's witness that he was requested by defense counsel to examine the latent print cards and determine if the defendant's prints could be found there. Nickoson agreed with Huston's conclusion that defendant's left ring finger matched favorably to the latent fingerprint found at the burglary scene.
Garry Richhart testified that the defendant, Jamie Chassereau, and he burglarized his aunt's home and stole several items. He indicated at the time of his testimony he was serving a two year sentence for the burglary and an unrelated corruption of a minor charge. Richhart admitted to giving conflicting statements on prior occasions about who committed the burglary. Specifically, he admitted he testified falsely at a preliminary hearing that the defendant was not involved in the burglary.
In his first assignment of error, appellant contends the trial court erred in overruling his motion to suppress the fingerprint test results because the State failed to present the book from which the latent fingerprint of the defendant was lifted. Specifically, appellant contends he was denied due process of law by the State's conduct.
We agree with the trial court's determination that the State's failure to preserve the book for further examination for exculpatory evidence was not violative of the defendant's due process rights. The State did preserve the latent print for examination by the defendant expert. That action preserved the defendant's due process rights. The first assignment of error is overruled.
In his second assignment of error, the defendant argues his conviction was against the manifest weight of the evidence and was insufficient as a matter of law. We disagree. There was more than ample evidence of defendant's guilt. The defendant's fingerprint was found at the scene of the burglary. Two experts offered their expert opinion in support of that evidence. No explanation was offered for the fingerprint. The accomplices testified against the defendant. The defendant's girlfriend placed the defendant in the company of the accomplices on the morning of the burglary and in possession of the stolen property later that day.
After weighing the evidence, we find the judgment is not against the manifest weight of it. See, State v. Thompkins
(1997), 78 Ohio St.3d 380, 386. Having determined that the judgment is not against the manifest weight of the judgment, it certainly is legally sufficient for due process purposes. See,Jackson v. Virginia (1979), 443 U.S. 307, 319. The second assignment of error is overruled.
In his last assignment, appellant argues that his trial counsel was ineffective in failing to object to the State's use of their expert, Ralph Nickoson, who confirmed that the defendant's fingerprints were on the victim's book. Defendant argues the State improperly used his counsel's work product to its advantage.
In Hickman v. Taylor (1947), 329 U.S. 495, the United States Supreme Court created the modern-day work product rule, holding that an attorney's trial preparation materials retain a qualified immunity during pretrial civil discovery. The court further stated that an attorney's mental impressions, personal recollections and legal theories enjoy near absolute protection from disclosure. Id. at 510, 512-513.
Although the work product doctrine arose in the civil context, the great majority of American jurisdictions now offer work product protection to both prosecution and defense in criminal litigation. See cases cited in Feldman, The Work ProductRule in Criminal Practice and Procedure, 50 U. Cin. L. Rev. 495 (1981).
In United States v. Nobles (1975), 422 U.S. 225, the Court held that the work product doctrine applies to criminal litigation as well as civil. Under F.R.C.P. 16(b) and (c), the work product doctrine protects material prepared by agents for the attorney as well as those prepared by the attorney himself.
 Although the work-product doctrine most frequently is asserted as a bar to discover in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case. At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself. Moreover, the concerns reflected in the work-product doctrine do not disappear once trial has begun. Disclosure of an attorney's efforts at trial, as surely as disclosure during pretrial discovery, could disrupt the orderly development and presentation of his case. We need not, however, undertake here to delineate the scope of the doctrine at trial, for in this instance it is clear that the defense waived such right as may have existed to invoke its protections.
 The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived. Here respondent sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. Respondent, by electing to present the investigator as a witness, waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination. See, e.g., McGautha v. California, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971).
Nickoson's report to defense counsel was not discoverable by the State since he was not called to the stand by the defense. See Crim.R. 16(C)(2).
In State v. Richey (1992), 64 Ohio St.3d 353, the Ohio Supreme Court held that a defendant's right to the effective assistance of counsel was not violated in a prosecution for murder in the course of an arson when the prosecutor called defense-retained expert as a state witness, where the expert did not disclose or rely on any confidential communications, but based his testimony upon physical evidence, reports, and photographs of fire. Chief Justice Moyer wrote at page 360 of the Court's opinion:
 The prosecutor's use of a defense expert does not violate an accused's Sixth Amendment right to counsel. Noggle, supra. Although the prosecutor's use of a defense expert may violate an accused's attorney-client privilege, Dubois did not disclose or rely upon any confidential communications here. Instead, Dubois based his testimony upon the physical evidence, reports, and photographs of the fire.
 By not objecting, Richey waived any attorney-client privilege as to Dubois. Moreover, no plain error exists; no manifest miscarriage of justice occurred because Dubois's testimony made no difference. The Fire Marshall's testimony that the fire had been caused by arson and accelerants was not otherwise contradicted. In such cases, the record must reflect prejudice before reversal is required. See [595 N.E.2d 923] Hutchinson v. People (Colo. 1987), 742 P.2d 875, 866; United States v. Talley (C.A. 9, 1986), 790 F.2d 1468; State v. Mingo, 77 N.J. at 588, 392 A.3d at 596.
In State v. Delaney (Sept. 2, 1993), Franklin App. No. 92-AP-1408, the court of appeals held that the use of a privately retained defense handwriting expert by the State of Ohio in rebuttal was error but not prejudicial error. Judge Reilly wrote the following on behalf of the court:
 Mr. Fraley had been retained and subpoenaed as a defense witness by appellant's trial counsel. The defense later obtained a continuance in an unsuccessful effort to allow Mr. Fraley to obtain a writing sample directly from appellant. Through these actions, appellee learned of Mr. Fraley's knowledge of the case and his subsequent availability as a witness. Appellant asserts that if prosecutors were permitted to call defense-retained experts to the witness stand, defense attorneys would be deterred from seeking out experts and developing work product on behalf of their clients.
 Appellee argues that its decision to call Mr. Fraley to testify did not contravene appellant's work product or attorney-client privilege. Instead, appellee contends that Mr. Fraley's investigation and findings were analogous to the results of laboratory tests or other evidence which would be readily discoverable by the prosecution.
 Appellee supports its contentions by stating that the Ohio Supreme Court has permitted defense-retained experts to testify on behalf of the prosecution. State v. Richey (1992), 123 L.Ed.2d 157. We find that the scope of Richey is far more narrow than what appellee maintains.
 Rather than issue the sweeping proposition of law that appellee suggests, Richey was strictly limited to its facts. In Richey, an engineer retained by the defense in a death penalty arson case was permitted to testify for the prosecution. However, Richey expressly conditioned its conclusion upon the failure of the defense to object to the engineer's testimony. As a result of the lack of an objection, the defendant waived his attorney-client privilege relating to the expert witness. Richey at 360. Subsequently, the plain error standard was applied in Richey to yield the conclusion that the engineer's testimony for the prosecution did not result in a manifest miscarriage of justice. Id. Richey took great pains to limit the applicability of its holding, declaring that "[t]he right to effective assistance of counsel includes access to defense experts, and the state's use of such witnesses could infringe an accused's attorney-client privilege. * * *" Richey at 359. Later, the opinion reiterates that "* * * the prosecutor's use of a defense expert may violate an accused's attorney-client privilege * * *." Richey
at 360.
 Unlike Richey, the appellant's trial counsel in the case sub judice, mounted a vigorous objection to the prosecution's attempts to call the defense-retained
expert to the witness stand. Therefore, there was no partial waiver of attorney-client privilege, and the plain error standard is not applicable on appeal. Under these circumstances, we are compelled to find that the admission of Mr. Fraley's testimony for appellee was contravention of appellant's attorney-client privilege.
 Despite the admission of Mr. Fraley's testimony and additional arguments that such evidence was improperly presented on rebuttal, we must also conclude that the trial court did not commit prejudicial error. As noted above, Mr. Fraley was merely one of two handwriting experts to testify for the prosecution. The eyewitness testimony and identifications of Ms. Beougher and Ms. Grubbs also provided independent support for appellant's conviction.
We agree with the Franklin County Court of Appeals that the use of a defense retained expert by the State over objection of defense counsel is error. However, we believe the use of such testimony contravenes the work product privilege enjoyed by the defendant. We recognize that if the State were permitted to call defense retained experts to testify against the defendant, defense attorneys would be deterred from seeking out such experts and developing work product on behalf of their clients.
We find that the defendant has failed, however, to demonstrate prejudicial error from this trial counsel's's ineffectiveness because there was no reasonable probability that, were it not for counsel's error, the result of the defendant's trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136. Nickoson's testimony was merely cumulative and there was strong evidence of defendant's guilt without his testimony. The appellant's third assignment of error is also overruled.
The judgment of the trial court is Affirmed.
FAIN, J., and KERNS, J., concur.
(Hon. Joseph D. Kerns, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
Richard M. Howell, Camille L. Harlan, Hon. Jonathan P. Hein